# Richmond

## DAVID LIGON PAYNE V. COMMONWEALTH OF VIRGINIA.

September 5, 1975.

Record No. 740719.

Present, All the Justices.

*Reid M. Spencer* (*William A. Wheary, III; Wolcott, Spencer & Rivers, P.C.*, on brief), for plaintiff in error.

*Gilbert W. Haith, Assistant Attorney General* (*Andrew P. Miller, Attorney General*, on brief), for defendant in error.

POFF, J., delivered the opinion of the court.

Indicted for the murder of his wife, David L. Payne was convicted by a jury of voluntary manslaughter, and judgment was entered on the verdict fixing his punishment at five years in the penitentiary.

The theory of Payne's defense was that his wife was murdered by an unknown intruder. The crucial question is whether the evidence, which was wholly circumstantial, was sufficient to identify Payne as the criminal agent.

Mrs. Payne was killed in her home on Halloween night, October 31, 1973. Payne gave the jury the following account of events. Payne and his wife had separated in August, 1973, and he had moved into an apartment. He arrived at his wife's home about 7:00 p.m. to see their young son, Davey, dressed in his Halloween costume. The couple sat and talked while Davey received "trick or treat" visitors. Mrs. Payne asked her husband to sit with Davey the following night, and he told her that he would call her later if he found that he could do so. Planning a hunting trip, Payne placed his shotgun and a box of shells in the trunk of his car and left for his parents' home about 8:00 p.m. During a telephone conversation with his wife around 9:35 p.m., she told him that she heard someone at the door and would call him later. When she failed to call, Payne called her at 10:00 p.m. and again at 10:15 p.m. but received no answer to either call. During a "break" for commercials on the television show "Kojak", he left in his car, a green Thunderbird with a dark top. He stopped at a store for three or four minutes to buy cigarettes, drove to his wife's house, and parked behind her car in the driveway. Seeing that the front door and storm door were ajar, he rushed into the house and called to his wife. Hearing no response, he ran upstairs to her bedroom. There, he found the dresser drawers open and clothing strewn about the floor. In a panic, he ran next door to get his neighbor, Calvin Childress, to help him find his wife. Payne and Childress returned to the Payne house, and, suddenly remembering that he had not seen Davey earlier, Payne went to the upstairs crib and took him in his arms. He and Childress searched the upstairs rooms and then the rooms downstairs. Payne opened the laundry room door, saw his wife lying in a pool of blood on the floor, and stepped back from the door. Childress examined the body, told Payne that his wife "would be okay as soon as they got blood in her", and, with Payne's assistance, telephoned for the police, the family doctor, and Payne's parents.

On cross-examination, Payne admitted telling a neighbor several hours before his wife's death that he "just wasn't going to take any more" from her.

Childress testified that he had looked at his watch at 10:35 p.m. and that Payne arrived at his door some three to five minutes later. As

he entered the Paynes' laundry room, he saw glass from two broken soft drink bottles and assumed that Mrs. Payne had suffered a "freak fall" on the two steps descending into the laundry room. Finding her body still warm, he told Payne that she was alive and that "she'll be all right." According to his estimate, five minutes elapsed from the time the body was discovered until the police arrived. During that time, Payne remained with Childress in the den and never returned to the laundry room. After the paramedics arrived and moved the body to the kitchen, Payne asked to see his wife but was told to return to the den. There, Childress said that Payne knelt on the floor and was "sitting on his haunches and sitting on his heels, and bending his head to the floor . . . saying, 'I want her, I need her.' " Asked if he could tell whether Payne was crying, Childress answered, "I did not see any tears, actual tears, wet tears." Childress also said that Mrs. Payne "was very, very particular about having her doors locked and lights on outside and very careful about letting people in."

Mrs. Laura Worth, Mrs. Payne's other next door neighbor, testified that her kitchen clock showed 10:25 p.m. as she sat down in her living room to finish some correspondence and balance her checkbook. Her kitchen window was partly open, and some five to seven minutes later, she heard a woman scream, "No, no, don't." The scream prompted her to recall that, while occupied with her tasks, she had been vaguely aware of "background noise" that "sounded like a fight" or "an argument next door." After she heard the scream, she "listened very hard" but "heard no dog bark, no child cry . . . no car, no doors, nothing." She turned on her outside lights, opened her front door, and looked towards the Payne house where the outside lights were also burning. Although her view was partially obscured by shrubbery, she saw "a large, late-model American made car . . . [with] a dark top" parked in the driveway behind Mrs. Payne's car. Mrs. Worth later reenacted the tasks she performed and timed her work at seven minutes. She testified that if, as she was told by the police, her clock was three minutes slow, the time she heard the scream was 10:35 p.m.

Payne's father testified that his son left his house at 10:28 p.m. during the television show "Kojak", a time he fixed after viewing a re-play of the show. He contradicted a statement he made to an officer several hours after the homicide when he had said that "I really don't remember what I was even watching on television" and that his son had left "somewheres close to 11:00."

Officer Watson arrived at 10:50 p.m., followed a minute later by the paramedics. After the body was moved to the kitchen and examined for vital signs, Watson and Payne went into the den. Asked to describe Payne's conduct, Watson testified:

"He acted more or less like what I would describe as a wild man. He was crawling around on the floor, stuff like that. He kept saying, 'It's my fault. I should have come home sooner.' He acted like he was crying, but there were no tears coming out. He was laying on the couch. He kept putting his hands over his face and breathing hard and trying to act like he was crying . . . . It looked like a put-on to me."

In a search of the house, the officers found jewelry in an open chest on the dresser, a pistol in an open dresser drawer, a coin collection, and silver tableware. Except for the front door, all exterior doors, including that in the laundry room, were locked, and none of the doors or windows showed any signs of forced entry. The handle of a mop was leaning against the laundry room door, and several toys, a basket, and other household articles were on the floor in its path. Examination of the soot and dust on the floor mat showed no "drag marks" such as would have been left had the laundry room door been recently opened against those articles. Officer Watson testified that when he entered the laundry room, the clothes dryer was operating and had consumed all but eight minutes of the 25-minute cycle.

The Commonwealth's evidence indicated that death resulted from six stab wounds, apparently inflicted with a single-edged, bladed instrument by a right-handed assailant attacking from the rear. Payne is right-handed. Although the murder weapon was never specifically determined, several steak knives, one containing a trace of unidentifiable blood, were found in the kitchen adjoining the laundry room. Bleeding from the wounds was predominantly internal with external seepage rather than spurting. Payne's clothing contained no blood stains. Mrs. Payne had not been attacked sexually.

Using a police vehicle and a stop watch, one of the officers made test runs over the route Payne took from his parents' home to the scene of the crime, a distance of three miles. Conforming to the 35 m.p.h. speed limit and stopping at the traffic lights Payne said he obeyed, one trip consumed "six to six and a half minutes." Another trip at 45 m.p.h. was completed in "four and a half to four forty-five"

minutes. Following his indictment, Payne made a test run which he timed at "ten minutes and forty-two seconds".

For some time prior to the killing, Payne had been having an illicit affair with another woman. It appears that Mrs. Payne had been unaware of this affair. However, she and her husband had engaged in heated arguments, and on one occasion, Payne had broken the door to the bathroom in which she had locked herself, and, on another, the handle on the front storm door. During police interrogation following his arrest, Payne denied that he was having an affair. However, at trial both he and the woman admitted that their relationship had been intimate, and Payne described several over-night trips they had made together to the District of Columbia, Pennsylvania, North Carolina, and Alabama. Payne, whose annual income was $25,000, admitted that during the two-month interval preceding his wife's death he was spending more than he was earning. He applied to a bank for a $1500 loan to buy a new car, he told his wife that he needed the money to buy a lot they had inspected and persuaded her to sign a note in blank. The proceeds of the loan were never used for either purpose. Payne said that, at his wife's request, he withdrew $3500 from their joint savings account and delivered it to her two days before she was killed. Records of banks in the community showed no deposits of such a sum in her name, and on the night of the murder, she borrowed $5.00 from her aunt for household expenses. Payne told the investigating officers that he realized that he would benefit financially from his wife's death. Mrs. Payne's estate, largely an inheritance from her mother, was valued at $61,500, and Mr. and Mrs. Payne had executed mutual wills.

In answer to an inquiry on the night of the murder as to what might be missing from the house, Payne told the police about the money he had given his wife, but he did not mention the denominations of the bills. On direct examination, Payne testified that the money, none of which was found in the house, consisted of $2500 in $20 bills and $1000 in $50 and $100 bills. On cross-examination, he said that he knew of no money in his car except "a couple of dimes and quarters laying on the dashboard." Following a conference with Payne's counsel, the attorney for the Commonwealth warned Payne that he intended to contradict his answer. In rebuttal, an officer testified that, in a search of the trunk of Payne's car, he had found a box of shotgun shells containing $1000 in $50 and $100 bills inside a bank envelope, and, attaching no significance to his discovery, had replaced the money in the box and left the box as he found it. In

surrebuttal, Payne repeated what he had said on direct examination concerning the box of shells. He then explained that, on November 8, 1973, while he was visiting a gunsmith, the box had been stolen from the front seat of his car. Payne objected to the officer's testimony on the ground that the Commonwealth had failed to make full disclosure in response to the trial court's discovery order.

The first of the two issues Payne addressed in oral argument was related to the error assigned to the admission of this testimony. The trial court granted Payne's pre-trial motion for an order requiring the Commonwealth to produce and make available for examination, *inter alia*:

"7. Any and all books, papers, documents, tangible objects, buildings or places, or copies or portions thereof, which are now or have been within the possession, custody or control of the Commonwealth in connection with or as a result of its investigation of this case."

In support of his motion in the court below, Payne avowed that paragraph no. 7 was "aimed at the actual production of the physical item." Yet, when objecting to the officers' testimony, he said that paragraph no. 7 was aimed at disclosure of *information* concerning the physical items found in his car, and on appeal, he argues that non-disclosure tainted the admissibility of that information.

Considering the plain language of paragraph no. 7 and Payne's unequivocal avowal, we agree with the trial court that the discovery order applied only to physical objects, and that non-disclosure of the information did not violate the terms of the order. We hold that the officers' testimony was properly admitted in evidence.

We consider next whether the evidence was sufficient to support the jury's verdict. We do so under the familiar principles that the evidence and every reasonable inference to be drawn therefrom must be viewed in the light most favorable to the Commonwealth, *Patler v. Commonwealth*, 211 Va. 448, 457, 177 S.E.2d 618, 624 (1969), and that a judgment on a jury's verdict "shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it". Code § 8-491 (Repl. Vol. 1957).

Circumstantial evidence may be sufficient to support a verdict, but where the evidence is wholly circumstantial, "[t]he burden is upon the Commonwealth to prove beyond a reasonable doubt that motive, time, place, means and conduct concur in pointing out the accused

as the perpetrator of the crime." *Boykins* v. *Commonwealth*, 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969).

Here, the jury could have concluded that the *motive* was money. In the critical period preceding the killing, the evidence was that Payne was spending more than he was earning; that he deceived his wife in order to negotiate a $1500 loan; that he withdrew $3500 from their joint savings account, $1000 of which was discovered in his shell box in the trunk of his automobile; and that he was a substantial beneficiary under his wife's will. The voluntary manslaughter verdict indicates that the jury found that the killing was committed in the heat of sudden passion. There was evidence of "a fight" or an "argument" preceding the scream. The jury reasonably could have inferred that the cause of that conflict was the money withdrawn from the joint account, or the proceeds of the loan, or Payne's infidelity (something previously unknown to Mrs. Payne).

Payne argues that the evidence concerning *time* and *place* is insufficient to identify him as the criminal agent. We do not agree. The critical time frame begins with Payne's departure from his parents' home. Payne said he left during a commercial "break" in a television show. Although his father fixed his departure at 10:28 p.m., his testimony contradicted his prior statement, and the jury could have believed that Payne left earlier. However, the test runs conducted by the police show that, even if he left at 10:28 p.m. and observed all traffic regulations, he could have arrived at his wife's house before 10:35 p.m., the time Mrs. Worth heard Mrs. Payne's scream; the jury was not bound to accept Payne's testimony that he stopped to buy cigarettes or that the trip required more than 10 minutes.

Comparing the descriptions given, the jury was justified in believing that the car Mrs. Worth saw at the Payne house less than a minute after she heard the scream was Payne's car. If it was not, then that car must have left and Payne's car arrived sometime before 10:40 p.m. when Payne appeared at Childress' door. Yet, Mrs. Worth testified that, although her window was open and she listened intently, she "heard no dog bark, no child cry . . . no car, no doors, nothing."

Payne asserts that the evidence failed to exclude a hypothesis of innocence, *i.e.*, that the criminal agent was an unknown intruder bent on burglary. Living alone with a small child, Mrs. Payne was very security-conscious. Police inspection of the premises showed that the doors and windows were locked and bore no signs of forced entry. A pistol, jewelry, and other valuable articles were found in

places the most inept burglar could not have overlooked. The fair inferences from such evidence are that there was no burglar, that there was no money in the house, and that the disarray in the decedent's bedroom was deliberately contrived to simulate a burglary. While the Commonwealth must overcome the presumption of innocence vouchsafed to an accused, it is not required to negate every possible theory of innocence but only those which raise a reasonable doubt of guilt. *Orange v. Commonwealth*, 191 Va. 423, 443, 61 S.E.2d 267, 276 (1950); *Smith v. Commonwealth*, 185 Va. 800, 820, 40 S.E.2d 273, 282 (1946).

Clearly, the *means* by which the crime was committed was readily available to Payne. While the weapon used to stab the victim was not specifically identified, several knives were found in the kitchen adjacent to the laundry room. Considering the bleeding characteristics of the wounds and the fact that the attack was made from the rear, the absence of blood on Payne's clothing, though relevant, was not dispositive.

In determining the question of criminal agency, the jury may properly consider every inference fairly deducible from the *conduct* of the accused. Payne had quarreled with his wife repeatedly, heatedly, sometimes violently, and only a few hours before her death, had told a neighbor that he "just wasn't going to take any more." The account he gave of his own behavior after he discovered the disorder in his wife's bedroom was suspect; without bothering to look in the child's cribroom or to search the laundry room where the clothes dryer was operating, he "panicked" and ran for help. Childress told him that his wife was still alive; yet, Payne made no effort to examine her bleeding body or to offer his wife aid or comfort during the five minutes they waited for the police to arrive. Thereafter, his conduct appeared to be more a pantomime than a genuine manifestation of grief.

We are of opinion that the evidence was sufficient "to prove beyond a reasonable doubt that motive, time, place, means and conduct concur in pointing out the accused as the perpetrator of the crime."

Upon careful consideration of the other issues argued on brief, we find no reversible error, and the judgment is

*Affirmed.*