### Richmond

## Willie Leroy Jones

### v.

## Commonwealth of Virginia

Record No. 840826.

November 30, 1984.

Present: All the Justices.

432

*Boyd M. Sears, Jr.*, for appellant.
*Robert Q. Harris, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

A jury empanelled pursuant to the bifurcated procedure mandated by Code §§ 19.2-264.3 and -264.4 convicted Willie Leroy Jones of two counts of capital murder. Each count charged a "willful, deliberate and premeditated killing . . . in the commission of robbery while armed with a deadly weapon," Code § 18.2-31(d), and a "willful, deliberate, and premeditated killing of more than one person as a part of the same act or transaction," Code § 18.2-31(g). On each count, the jury found that the defendant's "conduct in committing the offense . . . was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim," Code § 19.2-264.2, and fixed his penalty at death on each count. The trial court considered the report of the probation officer as required by Code § 19.2-264.5 and entered judgment confirming the verdicts. The automatic review of the death sentences mandated by Code §

17-110.1 has been consolidated for adjudication with Jones' appeals from the capital convictions and in accordance with Code § 17-110.2, has been accorded priority on our docket.[1]

## I. MOTION TO DISMISS

Prior to oral argument, the Attorney General filed a motion to dismiss these appeals on the ground that Jones, in company with five other inmates of Mecklenburg Correctional Center, had "escaped from lawful custody" on May 31, 1984 and that his escape "disentitles him to call upon the resources of this Court for determination of his claims."

The Attorney General made a similar motion in *Sherman* v. *Commonwealth*, 55 Va. (14 Gratt.) 677 (1858). Denying the motion, this Court ordered "that said writ of error be dismissed on the first day of May next, unless it shall be made to appear to this court, on or before the day last aforesaid, that said plaintiff in error is in custody of the proper officer of the law." *Id.* at 678. The same course was followed in *Leftwich* v. *Commonwealth*, 61 Va. (20 Gratt.) 716, 723 (1870).

It appears that Jones surrendered himself on June 8, 1984 and has been in custody since that date. Adhering to precedent, we deny the motion, conduct the review mandated by Code § 17-110.1, and consider all issues framed on appeal. *See Tuggle* v. *Commonwealth*, 228 Va. 493, 323 S.E.2d 539 (1984) (this day decided).

## II. THE CORPUS DELICTI

At approximately 1:00 p.m. on May 13, 1983, Wendell Jones (apparently unrelated to the defendant) noticed smoke emanating from the home of Graham and Myra Adkins, located on Route 609 in Charles City County. He knocked on the front door and, receiving no answer, broke through the locked door. Lying on the floor near the door was the body of Graham Adkins. With the help of two companions he carried the body outside, but the intensity of the fire and smoke forced him to abandon further rescue attempts.

---

[1] During the guilt stage of the same trial, the jury also convicted Jones under indictments charging robbery, arson, and two counts of use of a firearm in the commission of a felony. The trial court confirmed the several verdicts and imposed the sentences fixed by the jury. Those judgments are not before us on this appeal.

After the fire had been extinguished, the police and other local authorities examined the body and searched the remains of the dwelling. Evidence of petroleum distillates showed that the fire was of incendiary origin. An empty safe was found in a bedroom and the door of the safe in another room. The investigators discovered the incinerated remains of Myra Adkins in a bedroom closet. Both victims had been shot in the head at close range with a .25 caliber gun. Other results of the autopsies of the two bodies are detailed later in this opinion.

## III. THE CIRCUMSTANCES

Aside from the defendant's self-incriminating statements (which the trial court excluded on *Miranda* grounds), the evidence against him was wholly circumstantial. From February until sometime in April 1983, Jones had lived with William Cooke, the son of Mrs. Adkins and stepson of Graham Adkins, in Cooke's trailer located about 50 feet from the Adkins' home. During this period, Jones and Mrs. Adkins had become "quite close", and Jones had been to the Adkins' home.

Sheriff Harmon White testified that on May 2, 1983, 11 days before the murders were committed, he was called to the Adkins' home to investigate a burglary complaint. While there, he saw a safe containing stacks of paper money of various denominations. The money was wrapped in separate packages, individually labelled as to value. Sheriff White removed and "handled" about half the bills which he described as having "a moldy . . . musty smell" and "a red stain."

William Cooke testified that Graham Adkins kept his life's savings in a safe in his home and that the money "smelled earthy and it had a brownish-reddish tint". Cooke said that his stepfather had called him to his home on May 2. When he arrived, he found that a window had been broken, that a door had been forced open, and that money normally kept in a box under the bed was missing. When asked what else was missing, he replied, "I didn't remember seeing the gun, the .25 automatic he usually kept beside his bed on a little night stand." A delivery man saw Jones in the area of the Adkins' home on a Monday in "the middle of April or the first part of May." May 2 was a Monday.

The chronology of events on Friday, May 13, 1983, is significant. Charles Armstead testified that he picked up Jones around 11:00 a.m. on State Route 5 and carried him to State Route 609.

Jones got out of the car at a point one mile south of the Adkins' home, "said he was going to visit some friends", and started walking north. Jones, who had "kind of curly hair", wore a "jacket", "a pack on his back", "a baseball cap", and "sun shades", and carried a "briefcase".

Joseph Crump, who was driving north on Route 609 about 11:20 that morning, passed a man walking in the same direction at a point one quarter mile south of the Adkins' home. The man had curly hair, was wearing a cap, jacket, and sunglasses, and carried a shoulder bag. As Crump drove past the Adkins' home, he saw Graham Adkins standing on his front stoop.

The fire had been discovered around 1:00 p.m. About the same hour, Thomas Jones, Jr., (apparently unrelated to the defendant or Wendell Jones) was standing with his wife in their yard near Route 607 when they saw a man walking east from Route 609 along Route 607. The man passed about 13 feet from the witnesses, and their description of his attire and appearance matched that given by Armstead and Crump. Mr. Jones described his gait as "[s]ort of fast pace, real fast." Mrs. Jones said that "I had never seen anyone walk that fast before in my life." She added that the man "was carrying something" under a coat and "he switched whatever he had in his hand [and] switched the coat to cover whatever was under the coat." Both witnesses made positive in-court identifications of the defendant as the man they saw that day.

Sometime after 1:30 p.m., Robert Morton was cutting grass in a lawn east of the home of Thomas Jones when his attention was called to a man walking along Route 607. He testified that "the speed at which the person was walking made me notice him more than I would any other person." The man had curly hair and was wearing a "suit jacket, with a cap that was pulled down quite low, sunglasses, or dark glasses." The man had a "second jacket or suit coat hanging on his right shoulder" and "it looked as if he had something under his arm." Morton identified the defendant at counsel table as the man he saw.

At approximately 1:45 p.m., William Charity picked up a pedestrian on Route 607 and gave him a ride to Route 5. The man gave Charity a five dollar bill which Charity said "smelled earthy." Jones "reached underneath the coat" which was "[l]aying across his lap" to get the bill. Charity identified the defendant in court as the man who had given him the money.

A man walking along Route 5 hailed a taxicab sometime between 2:00 p.m. and 3:00 p.m. Cecil Maples, the driver, identified Jones as his fare and said that Jones "seemed like he was mighty nervous and wanted to talk." Jones had a coat on his arm and "there was something under the coat," Maples said. Jones registered at a Richmond motel for the night and, according to the desk clerk, he was carrying "a big wad of money". Jones listed his address as "Fort Carson".

At 7:00 p.m. that evening, Jones telephoned his girlfriend Michele Ford, claiming that he was calling from California. Two days earlier, he had told her that he was going to Hawaii and would be leaving on Friday, May 13. Jones invited Ford to join him in Hawaii, and he wired her $1500. Ford decided not to make the trip, and Jones told her to keep the money. Ford testified that she had never seen Jones wearing jewelry.

Jones made purchases totalling $338 at a store in Richmond and spent the night of May 14 in a Richmond hotel. On May 15, he hired a taxicab to take him to Washington, D.C. He was dressed in clothes which appeared to be new, paid the fare with two new fifty-dollar bills, and told the driver that he was going to Hawaii.

Two days later, Jones bought a second-hand sportscar from Dean Barnett, a salesman at a car dealership in Hawaii. Jones identified himself on the purchase papers by his correct name and listed his address as "Aloha Surf Waikiki, Honolulu, Hawaii". Barnett testified that Jones was wearing "Pierre Cardin shoes, brand new; knee high beige socks; some type of safari shorts; very flashy shirt; and a little beanie". "[H]e had a lot of jewelry on", including three or four rings, two gold chains, and a wrist watch. Jones paid Barnett $5,500 in cash. Barnett said that the money was "very old money", some was "dated back to 1950, some silver certificates." The money was "sticky and moist" and "stuck together". "[W]e had to count it . . . about three or four times to make sure the proper amount was there", and "we had to literally peel it off and sometimes had to snap it to make the dollar break." Jones produced the bills from a "Ziplock baggy" which he carried in "a black suitcase".

Jones was arrested in the hallway of a hotel in Waikiki on May 20. The police seized a quantity of jewelry and a briefcase found in his room. The briefcase contained a total of $28,733 in bills of various denominations. Police Sergeant Richard Phillips, one of

the arresting officers, testified that "[t]he money had rust-colored blotches on it and was very hard to count. It was old — seemed old, musky, there was a musky-type odor."

## IV. PRE-TRIAL ISSUES

### A. *Search and Seizure*

■ The trial court conducted two pre-trial hearings on the defendant's motion to suppress evidence seized in Hawaii. The arresting officers testified that when they encountered Jones in the hallway, they identified themselves and told him that he was "under arrest for extradition to Virginia." Jones "said he had valuables in his room and could he take them with him and have them secured." "[H]e gave us the key to the room" and, inside, pointed out several items of jewelry and "a black attache case" in which he said he kept his "life's savings". Jones gave the officers the combination to his briefcase and, at the police station, Officer Phillips opened it "to inventory the property that was submitted", counted the money, and gave Jones a receipt. Officer Kevin Kong testified that the briefcase was opened at Jones' request.

Defense counsel conceded at trial that the inventory search was "permissible in the law of the Commonwealth of Virginia." *See Hamby* v. *Commonwealth*, 222 Va. 257, 279 S.E.2d 163 (1981) (inventory search and seizure of contents of briefcase closed by a zipper). And on appeal, he acknowledges that the officers did not "violate the search and seizure provisions of the United States Constitution." He contends, however, that the law of the locus of the search controls and invokes the decision of the Supreme Court of Hawaii in *State* v. *Kaluna*, 55 Hawaii 361, 520 P.2d 51 (1974). There, the court, construing the state constitution, invalidated an inventory search of the contents of a paper packet voluntarily surrendered by a suspect undergoing a body search.

The defendant argues that the trial court's ruling against his motion to suppress denied him equal protection and due process of law "because the search of the briefcase . . . to inventory the money was illegal under Hawaiian law".

We assume, without deciding, that the law of Hawaii controls. Under the construction placed on the Constitution of Hawaii by the Supreme Court of that state, "[t]he government's interest in protecting itself against fraudulent post-incarceration claims of loss or damage to property is at best a tenuous reason for infring-

ing the privacy of an individual's belongings," and, consequently, "[t]o the extent that the basic purposes of an inventory search can be accomplished by means which are less intrusive on an internee's privacy, then . . . such means [must] be employed." *Kaluna* at 374, 520 P.2d at 61.

The *Kaluna* court rested its decision upon a finding that the defendant's surrender of the closed paper packet did not constitute consent to an inventory search of its contents and, hence, that the invasion of privacy was impermissibly intrusive under the Constitution of Hawaii. In a later case where the defendant challenged a search of the contents of a balloon seized from a body cavity, the Hawaiian court upheld the search on the ground that "unlike in *Kaluna*, the search of appellee was conducted with her full knowledge and freely given consent." *State* v. *Custodio*, 62 Hawaii 1, 6, 607 P.2d 1048, 1052 (1980); *see also State* v. *Martinez*, 59 Hawaii 366, 580 P.2d 1282 (1978). We conclude, therefore, that under the law of Hawaii, voluntary consent validates a warrantless inventory search.

Here, Jones asked the officers to take possession of his briefcase, gave them the combination to its lock, and expressly requested them to open it and secure his "life's savings". We are of opinion that Jones voluntarily waived his right to privacy and that the search of the contents of his briefcase was valid under the law of Hawaii.

## B. *Incriminating Statements*

The defendant incriminated himself in a statement made during custodial interrogation. Following a hearing on the defendant's motion to suppress, the trial court excluded the statement on *Miranda* grounds but ruled that the statement was made voluntarily and, therefore, was competent for purposes of impeachment.

On appeal, the defendant first contends that the evidence proves that the statement was not voluntary. The record shows that the defendant was intelligent and fully aware of his constitutional rights, and there is nothing to indicate that the police induced the statement by threats or promises of leniency or that they employed any form of fraud, deceit, or trickery. Yet, the defendant argues that "[b]y pleading, begging and cajoling, by subtle psychological pressure until appellant was in an emotional state of tears, the police broke down appellant's will."

We recently rejected the same complaint based upon similar facts and circumstances. *Rodgers* v. *Commonwealth*, 227 Va. 605, 318 S.E.2d 298 (1984). Whether the will of an accused has been overborne by the conduct of the interrogators is a question of fact to be determined by the trial court from "the totality of all the surrounding circumstances." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973). A finding by the trial court that the Commonwealth has borne its burden of proving voluntariness is entitled on appeal to the same weight as a factual finding by a jury. *Witt* v. *Commonwealth*, 215 Va. 670, 674-75, 212 S.E.2d 293, 297 (1975); *accord Stockton* v. *Commonwealth*, 227 Va. 124, 140, 314 S.E.2d 371, 381, *cert. denied*, 105 S.Ct. 229-30 (1984). We are of opinion the trial court's finding was clearly correct.

■ Nevertheless, the defendant argues that "[t]he trial Court's ruling . . . for all practical purposes removed from appellant the right to testify in his own behalf" because the statement, if used to impeach his testimony, "would have prejudiced the jury." This argument presupposes that the defendant had the right to take the stand and testify in a manner inconsistent with his prior statement. But "the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Oregon* v. *Hass*, 420 U.S. 714, 722 (1975).

## V. GUILT-INNOCENCE TRIAL

### A. *Admissibility of Jewelry*

■ Relying on *Robinson* v. *Commonwealth*, 212 Va. 136, 183 S.E.2d 179 (1971), the defendant claims that the trial court erred in admitting the jewelry into evidence because, he says, it had not been "authenticated by identification or chain of custody". We disagree.

Officer Phillips testified that he gathered the jewelry, at the defendant's request, and placed it in plastic bags. Each bag was labelled with a description of the contents, the time and place of the discovery, and the case number. At trial, Phillips identified the jewelry as corresponding to the item numbers and description on his inventory list.

"All that is necessary to establish a chain of custody of exhibits is that the evidence afford reasonable assurance that the exhibits at trial are the same and in the same condition as they were when

first obtained." *Smith* v. *Commonwealth*, 219 Va. 554, 559, 248 S.E.2d 805, 808 (1978) (citations omitted). The chain-of-custody standard announced in *Robinson* does not necessarily apply to a physical exhibit offered as demonstrative evidence as distinguished from an exhibit offered as a basis for a chemical analysis or the opinion testimony of an expert witness. *Whaley* v. *Commonwealth*, 214 Va. 353, 356-57, 200 S.E.2d 556, 558-59 (1973); *see Washington* v. *Commonwealth*, 228 Va. 535, 323 S.E.2d 577 (1984) (this day decided).

We conclude that the Commonwealth laid a foundation which fairly authenticates the demonstrative evidence, and we affirm the trial court's ruling.

### B. *Testimony Comparing the Money*

Sheriff White saw and handled the money in Adkins' safe a few days before it was stolen. Over the defendant's objection, he was permitted to testify that a few days after the robbery, "I saw this money again in Honolulu, Hawaii." He admitted on cross-examination that he had not examined the serial numbers of the bills on either occasion and that he "could only identify it by this color and the smell." The defendant argues that the witness should have "only been allowed to testify as to the similarities of the money . . . and not that the money was the same".

We reaffirm our holding in *Claud* v. *Commonwealth*, 217 Va. 794, 797-98, 232 S.E.2d 790, 792-93 (1977), where we said:

> We see no logic in a rule that would exclude the testimony of a lay witness that a common object he saw at one place was identical to or different from one he saw at another place. Like lay testimony identifying handwriting, *see* Fed. Rules Evid. Rule 901(b)(2), 28 U.S.C.A., such testimony is a statement of fact based upon personal observation and, as such, admissible for whatever weight the fact finder cares to give it.

### C. *Refusal to Sequester the Jury*

The defendant asks us to hold that the trial court abused its discretion in denying his motion to sequester the jury. His motion was based on his concern that the jurors might read or hear a

report in the news media concerning the confession excluded by the court.

At the defendant's request, venue had been changed from Charles City County where the crimes were committed to York County. Following an exhaustive *voir dire*, the trial judge instructed the jury not to read the newspapers or witness news broadcasts concerning the case, and the jurors promised to obey. He repeated those instructions each day when court adjourned. At the beginning of trial each day, he asked each juror whether he or she had read, seen, or heard any news reports or discussed the case with others. On each occasion, all jurors replied in the negative. Yet, the defendant argues on brief that "to believe that no such knowledge or discussion took place is unrealistic."

In effect, the defendant asks us to presume that the jurors violated their oaths, broke their pledges, and lied when they denied it. We presume the converse. "In the absence of some showing of juror exposure to prejudicial information, it will be presumed that the jury followed instructions to avoid such exposure." *Waye* v. *Commonwealth*, 219 Va. 683, 701, 251 S.E.2d 202, 213 (citation omitted), *cert. denied*, 442 U.S. 924 (1979).

Finding no proof of the prejudice the defendant hypothesizes, we uphold the trial court's ruling. *See Tuggle* v. *Commonwealth*, 228 Va. at 493, 323 S.E.2d at 539.

### D. *Sufficiency of the Evidence*

The defendant maintains that the evidence was insufficient to support the convictions.

Jones lived within 50 feet of the Adkins' home in a trailer owned by Mrs. Adkins' son. Jones and Mrs. Adkins became close friends. A sum of money kept in a box beneath the bed and a .25 caliber gun were stolen from the Adkins' home on Monday, May 2. Jones was seen in that vicinity on a Monday in April or early May. The murder weapon was a .25 caliber gun.

The murders and the related crimes were committed on May 13 between the hour of 11:20 a.m. when Crump saw Mr. Adkins standing on his front stoop and the hour of 1:00 p.m. when Wendell Jones discovered the fire. Crump and Armstead placed Jones on Route 609 during that interval, and he was walking in the direction of the Adkins' home. Shortly after discovery of the fire, Mr. and Mrs. Thomas Jones and Morton saw a man they identified in court as the defendant walking east from Route 609 along

Route 607. He was walking at an unusually fast pace and carrying an extra jacket which he used to conceal something he switched from hand to hand. At the motel where he registered that night he gave a false address. Apparently attempting to establish an alibi, he called his girlfriend from Richmond and told her he was in California. A few days later, he registered at a hotel in Hawaii.

Although Jones wore no jewelry, had no car, and could afford no place of his own to live prior to May 13, he suddenly began spending large sums of money. The record does not show the total amount Jones spent on hotel bills, taxicab and airplane fares, expensive jewelry, clothing, and luggage, but the cost of the sportscar was $5,500. He paid all these bills in cash. The money he gave Charity, Maples, and Barnett and the $28,733 found in his briefcase following his arrest bore the same indicia of age and decay as that which Sheriff White had examined in Adkins' safe on May 2.

Noting that, absent his confession, the evidence against him was wholly circumstantial, Jones complains that he was denied an instruction stating the rule that circumstantial evidence is insufficient to support a conviction unless it is strong enough to exclude every reasonable hypothesis of innocence. Reading the instructions as a whole, however, we find that they cover every essential element of that rule. Indeed, the defendant tendered and the trial court granted Instruction A which told the jury that "it is not sufficient that facts and circumstances proved be consistent with the guilt of the defendant, but they must be inconsistent with every reasonable hypothesis consistent with the innocence of the defendant."

We are of opinion that the facts and circumstances disclosed by the evidence and the fair inferences they raise are sufficient to prove "beyond a reasonable doubt that motive, time, place, means and conduct concur in pointing out the accused as the perpetrator of the crime." *Boykins* v. *Commonwealth*, 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969).

Still, the defendant argues that, even if the evidence proves his "involvement" in the crimes, "[o]nly . . . the triggerman can be convicted of capital murder", *see Johnson* v. *Commonwealth*, 220 Va. 146, 255 S.E.2d 525 (1979), *cert. denied*, 454 U.S. 920 (1981), and the evidence, he says, does not exclude the hypothesis that the defendant "served as a lookout while someone else committed the crime".

In *Payne* v. *Commonwealth*, 216 Va. 265, 217 S.E.2d 870 (1975), where the appellant argued that someone else may have committed the crime, we held that the Commonwealth "is not required to negate every possible theory of innocence but only those which raise a reasonable doubt of guilt." *Id.* at 272, 217 S.E.2d at 875. We find no evidence to support the theory suggested by counsel. Only one person was seen approaching and leaving the scene of the crimes. If there had been two criminal agents, it would have been unnecessary to bind and gag one of the victims while the safe was being looted. And it is sheer speculation to assume that a second person shot the victims, opened the safe, divided money difficult to count, and donated as much as $35,000 to a confederate acting as a lookout.

There was utterly no evidence to support the hypothesis the defendant advances. Therefore, there was no foundation for an instruction on the "triggerman" rule,[2] it was unnecessary for the verdict forms submitted to the jury to posit a verdict based upon that option, and the defendant had no grounds to require a poll of the jury on the question. Accordingly, we reject the defendant's assignments of error related to the sufficiency of the evidence.

### D. *Double Jeopardy*

The several crimes of which the defendant was convicted were charged separately in individual indictments and tried together in a single trial. The defendant poses a double-jeopardy question, tacitly concedes that the issue is controlled by *Fitzgerald* v. *Commonwealth*, 223 Va. 615, 292 S.E.2d 798 (1982), *cert. denied*, 459 U.S. 1228 (1983), and asks us to overrule *Fitzgerald*. We decline to do so.

## VI. PENALTY TRIAL

### A. *The Penalty Predicate*

A jury is authorized to impose a death penalty upon a finding of either or both of two "aggravating circumstances", *viz.*, that "there is a probability that the defendant would commit

---

[2] The record shows, however, that the trial court granted Instruction Q which told the jurors that if they believed that Jones "participated" in the crimes but did not personally commit "the act which killed Graham Adkins and Myra Adkins" they could not find him guilty of capital murder.

criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim". Code § 19.2-264.2. The Commonwealth's Attorney withdrew a proffered instruction on the "dangerousness" predicate, and the trial court, following the language of the statute, instructed the jury on the "vileness" predicate. The verdicts returned by the jury were based solely upon that predicate.

The defendant argues that the court's instructions failed to "provide clear and objective standards that provide specific and detailed guidance to a jury" and, hence, that the decision of the United States Supreme Court in *Godfrey* v. *Georgia*, 446 U.S. 420 (1980), mandates commutation of the two death penalties imposed upon him. In *Bunch* v. *Commonwealth*, 225 Va. 423, 447, 304 S.E.2d 271, 285, *cert. denied*, 464 U.S. 977 (1983), we rejected a similar argument and reaffirmed our holding in *Clark* v. *Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied*, 444 U.S. 1049 (1980), that a trial court is not constitutionally required to define the individual terms of the vileness predicate. *Accord Tuggle* v. *Commonwealth*, 228 Va. 493, 323 S.E.2d 539 (1984) (this day decided). Moreover, unlike the trial court in *Godfrey*, the court below granted two instructions offered by the defendant defining "aggravated battery" and "depravity of mind" as we defined those terms in *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979).

While the definitions in *Smith* were employed as an appellate standard in our review of the facts and circumstances in that case and were never prescribed as litmus tests for jury instructions in every case, a trial court is accorded "discretion to determine the advisability of explicating for the jury certain legal terminology used in the statute." *Coppola* v. *Commonwealth*, 220 Va. 243, 254, 257 S.E.2d 797, 805 (1979), *cert. denied*, 444 U.S. 1103 (1980). Considering the facts and circumstances in this case, we are of opinion that the trial court exercised sound discretion, and we reject the defendant's constitutional challenge.

## B. *Proof of the Vileness Predicate*

The defendant believes that the evidence was insufficient to prove the vileness predicate as defined in the instructions.

Dr. Marcella Fierro, who performed the autopsies on both bodies, testified that the "incinerated" body of Myra Adkins, aged 78, "was received in a yellow plastic sheet, and when I laid her out . . . her head and shoulders were there, her right arm was present, her left arm and hand were gone. The lower portions of her legs were absent. They had been burned away, and her feet were received with her body but separate from her body . . . . [S]trapping tape bindings that went around her mouth and . . . around her neck . . . held a gag, made out of a sock, that was two-and-a half inches down her mouth and throat." The gag "would impair breathing" but not stop it "right away." In the opinion of the witness, Mrs. Adkins' hands had been tied behind her back. Dr. Fierro testified further that Mrs. Adkins had been shot in the face at close range by a .25 caliber gun and that the bullet had "fractured the bone of the base of the skull, driving small pieces of bone into the brain . . . . The cause of death was carbon monoxide poisoning, from smoke inhalation . . . . The gunshot wound . . . was not one that would kill immediately or within a few minutes . . . it would have taken probably several hours for her to die of that injury."

The cause of death of Mr. Adkins, age 77, was a wound inflicted by a .25 caliber gun fired into his face at a distance "less than a foot." The bullet passed through "the pons which is a part of the control center on the underside of the brain." Dr. Fierro said that such an injury "usually results in a death which occurs in a very quick interval." There was no carbon monoxide present in his blood. Laboratory tests showed that his clothing and shoes had been saturated with gasoline and kerosene.

We consider, first, the evidence related to the murder of Mrs. Adkins. Mrs. Adkins, an elderly, defenseless lady who had befriended the defendant, was a victim of a series of vicious assaults, only the last of which proved fatal. Her assailant tied her hands behind her back, stuffed a sock down her throat, taped her mouth and neck to hold the gag in place, forced her into a closet, shot her at point-blank range in the face, doused her clothing with an accelerant, struck a match, and left her, still alive and breathing, to die of smoke inhalation. Although the evidence does not show whether or how long she remained conscious before she ex-

pired, it is reasonable to believe that the fire, which ultimately consumed one arm and most of both legs, could have caused her to suffer intense pain and terror for some period of time.

We consider the evidence of such facts and circumstances fully sufficient to support a finding by the jury of an "aggravated battery" and "depravity of mind" as those terms were defined in the court's instructions. *See Mason v. Commonwealth,* 219 Va. 1091, 1099, 254 S.E.2d 116, 121 (1979), *cert. denied,* 444 U.S. 919 (1979) (both findings sustained where elderly victim of rape "set on fire while still alive, although *in extremis*"). Indeed, we are of opinion that the evidence was sufficient for such purposes, even if Mrs. Adkins was unconscious before the fire was set. The words "aggravated battery" and "torture" ordinarily connote conduct preceding death of the victim. But "depravity of mind", which is cast in the disjunctive in Code § 19.2-264.2, "can exist independently of the presence of torture or aggravated battery". *Bunch v. Commonwealth,* 225 Va. at 442, 304 S.E.2d at 282. In our view, an aggravated battery such as mutilation, gross disfigurement, or sexual assault committed upon a corpse or an unconscious body evinces "depravity of mind" within the contemplation of our death-penalty statute. Courts in other jurisdictions have reached a similar conclusion. *See, e.g., Hance v. Georgia,* 245 Ga. 856, 268 S.E.2d 339, *cert. denied,* 449 U.S. 1067 (1980); *State v. Newlon,* 627 S.W.2d 606 (Mo.), *cert. denied,* 459 U.S. 884 (1982); *State v. Richmond,* 136 Ariz. 312, 666 P.2d 57 (1983); *Smith v. State,* 659 P.2d 330 (Okla.), *modified on other grounds,* 464 U.S. 924 (1983).

Unlike his wife, Graham Adkins died of a single assault. The bullet which pierced a vital part of his brain caused all but instant death. Citing *Godfrey v. Georgia,* 446 U.S. 420 (1980), we have said that "[a] death sentence based upon vileness is not supported by the evidence where the victim dies almost instantaneously from a single gunshot wound." *Peterson v. Commonwealth,* 225 Va. 289, 296, 302 S.E.2d 520, 525, *cert. denied,* 464 U.S. 865 (1983). Relying upon *Godfrey,* Jones insists that the death sentence imposed upon him for the murder of Graham Adkins must be commuted to imprisonment for life. We disagree.

*Godfrey* is instructive but clearly distinguishable. *Godfrey* killed two victims, each with a single shotgun blast. Emphasizing the evidence that both had died instantaneously, the Court con-

cluded that a multiple killing is not intrinsically vile within the meaning of a capital murder statute.

Here, Jones was convicted for the "killing of more than one person as a part of the same act or transaction". Code § 18.2-31(g). Obviously, a multiple killing is more heinous than a single homicide, but nothing in the record supports the theory that the jury rested its vileness finding solely upon the fact that Jones had killed more than one person. In determining vileness, the jurors must consider whether the defendant's "conduct in committing the offense . . . involved torture, depravity of mind or an aggravated battery", Code § 19.2-264.2, and they were so instructed. As distinguished from the situation in *Godfrey* where both victims died instantaneously, one of Jones' victims, Mrs. Adkins, survived the gunshot wound and, for some period of time, suffered the agonies of gradual incineration. Her husband escaped the aggravated battery she endured awaiting death and, by the chance intervention of a stranger, the gruesome mutilation inflicted upon her body. But, as part of a common criminal enterprise, Jones had soaked the clothing of Graham Adkins with accelerants, and the fact that his attempt to mutilate the lifeless body miscarried does not mitigate the vileness of his conduct. *See State* v. *Newlon*, 627 S.W.2d at 622.

As we have said, "depravity of mind" is a discrete underpinning of the statutory vileness standard, and we hold that the jury could have found that the killing of Graham Adkins was the result of conduct evincing depravity of mind within the intendment of Code § 19.2-264.2.

## C. *Propriety of the Sentence*

We now consider whether the death sentences were the product of "passion, prejudice or any other arbitrary factor," and, if not, whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1(C).

The defense introduced evidence in mitigation, including the testimony of two clinical psychologists, and the written verdict confirmed by the trial court shows that the jury "considered the evidence in mitigation." The defendant contends, however, that "introduction of the pictures of Mrs. Adkins' body at the sentencing hearing impassioned the jury . . . [and that] the

decision to impose the death sentence was . . . based on emotion rather than reason."

We have held repeatedly that the admissibility of photographs depicting the body of a murder victim is a matter within the sound discretion of the trial court. *See Washington* v. *Commonwealth,* 228 Va. 535, 323 S.E.2d 577 (1984) (this day decided); *Clozza* v. *Commonwealth,* 228 Va. 124, 135, 321 S.E.2d 273, 280 (1984); *Stockton* v. *Commonwealth,* 227 Va. at 144, 314 S.E.2d at 384. Such pictures are relevant in the guilt trial to show premeditation and malice and, in the penalty trial, to illustrate the nature and degree of the vileness of the crime. Here, the pictures were as "graphic" as those in *Stockton,* 227 Va. at 144, 314 S.E.2d at 384; as "gruesome" as those in *Whitley* v. *Commonwealth,* 223 Va. 66, 74, 286 S.E.2d 162, 167, *cert. denied,* 459 U.S. 882 (1982); and as "hideous and grotesque" as those in *Waye* v. *Commonwealth,* 219 Va. at 692, 251 S.E.2d at 207, but "no more inflammatory than the medical testimony detailing the results of the autopsy", *Smith* v. *Commonwealth,* 219 Va. at 468, 248 S.E.2d at 143.

The defendant suggests nothing further in support of his argument that the death sentence was the product of passion or bias, and the record reveals none.

Finally, the defendant argues that the death sentences were "excessive and disproportionate to the penalty imposed in similar cases." He cites no cases in support of his argument.

Pursuant to Code § 17-110.1(E), we have accumulated, segregated, and indexed "the records of all capital felony cases . . . as a guide in determining whether the sentence imposed in the case under review is excessive." Our review of those cases discloses none fairly comparable to the one at bar in which a jury fixed a life penalty, a trial judge overturned a death penalty fixed by the jury, or this Court commuted a death sentence confirmed by a trial judge.

On the other hand, the facts and circumstances detailed in the records of all the cases where the jury based a death penalty upon the vileness predicate reflect a degree of depravity of mind closely akin to that involved here.[3]

---

[3] *See LeVasseur* v. *Commonwealth,* 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied,* 464 U.S. 1063 (1984) (victim stabbed in the head, stabbed elsewhere after death, body soaked with liquid bleach); *Bunch* v. *Commonwealth,* 225 Va. 423, 304 S.E.2d 271, *cert. denied,* 464 U.S. 977 (1983) (defendant shot victim in head, garroted her, and hanged her

As the cases listed in the margin illustrate, juries in this jurisdiction customarily "impose the death sentence for conduct similar to that of the defendant," *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980), and we will affirm the convictions and the penalties imposed by the trial court.

*Affirmed.*

body on a doorknob); *Fitzgerald* v. *Commonwealth*, 223 Va. 615, 292 S.E.2d 798 (1982), *cert. denied*, 459 U.S. 1228 (1983) (defendant mutilated victim with machete and knife, kicked her dead body at burial); *Whitley* v. *Commonwealth*, 223 Va. 66, 286 S.E.2d 162, *cert. denied*, 459 U.S. 882 (1982) (death caused by neck wound or strangulation, defendant inserted umbrellas in victim's vaginal and rectal cavities); *Justus* v. *Commonwealth*, 222 Va. 667, 283 S.E.2d 905 (1981), *cert. denied*, 455 U.S. 983 (1982) (pregnant victim shot twice in the head, raped); *Coppola* v. *Commonwealth*, 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied*, 444 U.S. 1103 (1980) (death caused by choking and blunt force injuries to the head); *Clark* v. *Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied*, 444 U.S. 1049 (1980) (victim shot five times in the head and chest); *Waye* v. *Commonwealth*, 219 Va. 683, 251 S.E.2d 202, *cert. denied*, 442 U.S. 924 (1979) (victim beaten and stabbed, corpse doused with Clorox bleach).