# Richard T. Boggs

## v.

# Commonwealth of Virginia

Record Nos. 841860 & 850170

Decided June 14, 1985, at Richmond

Present: All the Justices

502

*Darell Sayer (Anthony J. Nicolo; Sayer & Nicolo*, on brief), for appellant. (Record Nos. 841860 & 850170.)

*Robert H. Anderson, III, Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee. (Record Nos. 841860 & 850170.)

POFF, J., delivered the opinion of the Court.

A jury convicted Richard T. Boggs, 21 years of age, of robbery and, in the same trial, capital murder in the commission of robbery. On the robbery conviction, the jury fixed the penalty at imprisonment for life. After hearing evidence of aggravating circumstances and circumstances in mitigation of the offense in a separate proceeding, *see* Code §§ 19.2-264.3 and -264.4, the jury fixed the penalty on the homicide conviction at death. The trial court, following consideration of the probation report required by Code § 19.2-264.5, entered final judgments confirming the convictions and imposing the penalties fixed by the jury.

Pursuant to Code § 17-116.05:1, Boggs filed a petition for appeal of his robbery conviction in the Court of Appeals. We entered an order on March 5, 1985 certifying the robbery appeal to this Court and consolidating that appeal with Boggs' appeal of his capital murder conviction. Code § 17-116.06(B)(1). In turn, we

have consolidated the capital murder appeal with the automatic review of the death penalty, Code § 17-110.1, and accorded the two appeals and the penalty review priority on our docket, Code § 17-110.2. The four questions presented by the petition for appeal of the robbery conviction are subsumed in and addressed by the briefs filed in the capital case, and our adjudication of those issues applies to both appeals.

In his several challenges to the facial constitutionality of the capital-murder statutes, raised by motions *in limine* and renewed at trial, Boggs makes no argument which has not been considered and rejected by this Court in earlier cases, and we devote this opinion to the other questions raised on brief and to the penalty review mandated by statute.

## I. THE EVIDENCE OF RECORD

Boggs does not question the sufficiency of the competent evidence to support the two convictions. Rather, he contends that the trial court committed multiple errors which entitle him to new trials on the charges or to commutation of the death penalty, and we look to all the evidence adduced at the suppression hearing, the guilt trial, and the penalty trial.

Treeby Shaw, an 87-year-old widow, was murdered and robbed in her home in the Cradock community on the night of January 25, 1984. The homicide squad compiled a list of 20 people they "wanted to talk with". One was Richard T. Boggs, a close neighbor. Boggs, who worked at night while attending college during the day, was not considered "a prime suspect" and, for more than three weeks, was never questioned about the crimes.

At 1:15 a.m. on February 17, 1984, Officer Frank Cohn received a radio report from the police dispatcher that a black pedestrian had been struck by a blue Volkswagen operated by a "white [driver] with blonde hair." Lonnie Penn, who witnessed the event, testified that he pursued the Volkswagen in his car until it stopped at a gasoline station. Penn tried to persuade the driver, the sole occupant of the Volkswagen, "to go to the scene of the crime". Instead, the driver "[t]ook off down the freeway". Penn followed, blowing his horn and "flashing" his headlights. Officer Cohn observed the two vehicles, gave chase, and eventually stopped the Volkswagen on the shoulder of the road. The driver, later identified as Boggs, "jumped out . . . and started to run" but stopped at Cohn's command. Cohn "pushed him up against

the Volkswagen", which had "visible damage on the front end", and began a body search. Boggs protested, "Hey, man, I didn't do nothing. That nigger jumped off the sidewalk onto the front of my car."

At this point, Officer Richard A. Markel, who had heard the dispatcher's description of the Volkswagen and its driver, arrived on the scene, overheard Penn's conversation with Officer Cohn, and "placed [Boggs] under arrest for a hit and run felony investigation and DUI."

The pedestrian died of his injuries and, at 2:40 a.m., Officer T. E. Dail administered the *Miranda* warnings and Boggs signed a waiver authorizing the officer to question him on charges of "involuntary manslaughter" and "felony hit/run". Then, in his own handwriting, Boggs made and signed a statement which the Commonwealth introduced at the suppression hearing. According to that statement, "a black male ran directly into left front fender" and Boggs stopped his car at a gas station, walked back to look for the pedestrian, "did not see anyone", and "then left scene of accident."

When Detective Allen R. Harvey, an officer assigned to the homicide squad, learned that Boggs was in custody, he "talked to him briefly, more or less, informally, as a possible witness". He did not consider it necessary to advise him of his *Miranda* rights. Harvey had heard that Boggs had attempted to sell a ring to Leon Rawls, but he "had no idea at that point if it was connected with Treeby Shaw's case or not." The conversation, memorialized in a written statement identified as "2-17-84 0325 Hrs", was introduced at the suppression hearing. The exhibit shows that Harvey inquired when Boggs had seen Mrs. Shaw last, where he was on the night she was killed, and whether he knew "anyone who would want to hurt Mrs. Shaw". Harvey made no accusations and Boggs made no incriminating statements.

Meanwhile, the Volkswagen had been towed to police headquarters. Sometime "between three and four o'clock", Officer Markel conducted an inventory search of the vehicle. Markel testified that this was a matter of "police department policy", designed to furnish the owner a list of his property and to protect the police against false claims of theft from an impounded vehicle. Markel opened the trunk and picked up what he described as a "heavy" blue bag. When he opened the bag, he found two boxes,

one bearing the name "Shaw", and a plastic pouch containing silverware inscribed "Treeby".

Markel interrupted the inventory and notified Harvey that he had discovered the fruits of the Shaw robbery, and Harvey obtained a warrant and conducted a further search. At 6:25 a.m., Harvey told Boggs about the silverware and advised him that the police "had evidence that would link him to the murder of Treeby Shaw, and he was at that point a suspect." In the company of Detective James E. Roberts, Harvey administered the *Miranda* warnings, Boggs signed a waiver of his rights, and the two officers interrogated him. The interview was reduced to writing and, at 7:10 a.m., Boggs subscribed the document and initialed each of the five pages.

Boggs' confession was detailed and unequivocal. He acknowledged that he had "preplanned the murder" of Mrs. Shaw. At 7:00 p.m., he "knocked on her door for a friendly visit, to borrow a book". In his pocket he carried "a round hunk of steel about 4 inches long and 1 inch in diameter". She offered him tea, and he "drank 3 cups" while they talked. "It was about 8:30," he said, "I started pounding her in the head with the metal weapon. There was no struggle. She fell on the first blow to the head. I continually pounded her head . . . and she didn't die. So I went in the kitchen and got a butcher knife and I repeatedly stabbed her, until I heard no more breathing." Boggs "searched the house for money." Finding only "one $10.00 bill and small change" which "wasn't enough to support my habit of drugs", he collected her silverware in a bag, removed the rings from her fingers, and tried, unsuccessfully, "to take her T.V." He said that the rings were "in Norfolk pawn shops under the name of Mark Smith" and that the metal bar and silverware were in his car. In a statement, which was unresponsive to any question asked, Boggs said, "I want to kill niggers, I'm a cold blooded killer". Boggs added that he had consumed a "six pack" the night before but that he was not drunk during the interview.

The trial court overruled the motion to suppress this confession and, over the defendant's objection, the Commonwealth introduced it at the guilt trial. Boggs also objected to certain other evidence admitted during the guilt phase which we will detail later in this opinion.

At the penalty trial, Boggs testified in his own behalf. Honorably discharged from the Army, he enrolled in Tidewater Com-

munity College and found a nighttime job with a plastics firm. He admitted killing and robbing Mrs. Shaw whom he had known "as a close neighbor" all his life. He "felt horrible about it for a long time." In explanation of his conduct, he said that he had been using drugs "[s]ince junior high school" and had used some the day of the crime.

On cross-examination, Boggs was asked to read the confession he had signed. He confirmed the truth of its contents and enlarged upon the details. Clarifying an ambiguity in the sequence of events, he said that he conducted the search for the silverware in an interval of time between the assault with the metal bar and the stabbing. Before he got the butcher knife from the kitchen, he "could hear her breathing in the next room." He stabbed her in several places and, responding affirmatively to the Commonwealth's questions, he acknowledged that he "didn't draw the knife all the way out" but, instead, repeatedly "jammed it back . . . in that same hole".

As evidence in mitigation of the offense, Boggs called a number of witnesses. Several friends and relatives testified that they had known him as a kind, considerate, and respectful youth. His father read a letter written by his son, expressing sorrow for the trouble he had caused so many people, and his mother testified that he was "absolutely devastated" and "so ashamed of his own life". Dr. E. Daniel Kay, Jr., a psychiatrist, opined that Boggs' capacity to conform his conduct to the requirements of the law was impaired by the use of alcohol and drugs and that, considering his personality and immaturity, "he certainly had much better than average possibility of rehabilitation."

Consistent with his testimony at the guilt trial, Dr. Faruk Presswalla, the Commonwealth's Deputy Chief Medical Examiner, particularized the nature and extent of the wounds inflicted on Mrs. Shaw. His examination disclosed that she had suffered multiple blunt-force blows to the back of the neck, two in the temple region, and four in the back of the head. Her left ear had been lacerated in two places. A stab wound on the left shoulder had penetrated a depth of nearly four inches and cut an artery in the neck. Another stab wound began on the left side, "went up to the right breast for eleven inches, and cut through her heart, which was the cause for internal bleeding. . . . [A]lthough the knife had been penetrated only once, it had been partially withdrawn and re-thrust in at least three times." The force of the thrusts

fractured three ribs in back and three in front. Dr. Presswalla concluded that, while the blunt-force blows to the head would have caused death "ultimately", "that wouldn't have killed her right away or as quickly as the stab wound" which, he said, "sliced the entire front wall of the right ventricle."

## II. PRE-TRIAL ISSUES

### (1) *Search and Seizure*

Boggs contends that his arrest was unlawful, that the search of his automobile was not justified as incident to arrest or by any other exception to the warrant requirement of the Fourth Amendment, and that the trial court erred in overruling his motion to suppress the evidence seized from his car.

■ Boggs insists that Officer Markel arrested him for the traffic offenses without probable cause. It is true, as the defendant says, that Markel "never saw Boggs operate the motor vehicle." But Markel had heard the dispatcher's report of the pedestrian injured in the hit-and-run offense, he knew the description of the car and driver involved, both were in plain view when he arrived, the front end of the Volkswagen was plainly damaged, and Markel overheard Penn's eyewitness account of what had happened and who was involved. As reported by the dispatcher, the hit-and-run offense was a felony, *see* Code §§ 46.1-176, -177, and we believe the officer would have been derelict in his duty had he failed to place Boggs under arrest.

■ The trial court did not approve the search as incident to arrest but as an inventory search conducted in accordance with established police policy. "The decisions of [the Supreme] Court point unmistakably to the conclusion . . . that inventories pursuant to standard police procedures are reasonable." *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976); *see also Cabbler* v. *Commonwealth*, 212 Va. 520, 184 S.E.2d 781 (1971), *cert. denied*, 405 U.S. 1073 (1972). "[T]hree interests generally have been advanced in support of inventory searches: (i) protection of the police from danger; (ii) protection of the police against claims and disputes over lost or stolen property; and (iii) protection of the owner's property while it remains in police custody." *Opperman* at 378 (Powell, J., concurring); *see also Reese* v. *Commonwealth*, 220 Va. 1035, 1039, 265 S.E.2d 746, 749 (1980).

■ Boggs charges that the inventory was "a sham", designed to disguise an investigatory search. Officer Markel testified that Boggs' name had been "given to us along with a couple of other names, that Detectives Roberts and Harvey wanted to talk to . . . [i]n regards to a homicide in Cradock." Based on this comment, Boggs suggests that "it is just as likely that the evidence was discovered during the course of a fishing expedition to obtain evidence in the murder case." But the defendant overlooks the fact that, at the time the inventory was conducted, the homicide detectives still considered Boggs only "a possible witness". Boggs did not become a "suspect" until Markel discovered Mrs. Shaw's silverware. Accordingly, we affirm the trial court's conclusion that the inventory search was conducted in good-faith compliance with standard police procedures.

■ Boggs next contends that "[e]ven if . . . there was a legitimate inventory search . . . evidence seized from a closed container . . . should be suppressed." We expressly rejected a similar argument in *Hamby* v. *Commonwealth*, 222 Va. 257, 279 S.E.2d 163 (1981) (upholding search of closed briefcase seized in inventory search); *cf. Abell* v. *Commonwealth*, 221 Va. 607, 272 S.E.2d 204 (1980) (inventory-search exception not in issue).

Boggs invokes the holding in *Robbins* v. *California*, 453 U.S. 420 (1981), decided a month after our decision in *Hamby*. There, the Supreme Court invalidated a warrantless search of a closed container found in the luggage compartment of an automobile involved in a traffic violation. But the search in that case was not conducted for inventory purposes, and nothing in the decision negates the principles underlying the inventory-search exception to the warrant requirement. Moreover, the *Robbins* Court wrote five opinions. In a case decided a year later, the Supreme Court, noting that "there was no Court opinion supporting a single rationale for its judgment" in *Robbins*, expressly renounced "the precise holding" in that case. *United States* v. *Ross*, 456 U.S. 798, 824 (1982). The *Ross* Court upheld a warrantless search of a closed bag seized during a probable-cause search of an automobile. And, in *Illinois* v. *Lafayette*, 462 U.S. 640 (1983), where the defendant was arrested for disturbing the peace but convicted of a drug offense, the Court approved an inventory search of a shoulder bag, conducted at police headquarters as part of routine procedures incident to booking and incarceration of a suspect. More recently, the Supreme Court, citing *Ross*, rejected a challenge to evidence

discovered in a warrantless search of packages, conducted three days after they had been lawfully removed from two pickup trucks. *United States* v. *Johns*, 105 S.Ct. 881 (1985).

The decisions in *Ross, Lafayette,* and *Johns* confirm the constitutional sufficiency of the rule we adopted in *Hamby,* and we apply it here. Specifically, we hold that the search of a closed container, discovered in the course of a legitimate inventory of the contents of a motor vehicle in lawful police custody, is not unreasonable within the intendment of the warrant requirement of the Fourth Amendment. Hence, we affirm the trial court's ruling on the defendant's motion to suppress the evidence seized from his car.

### (2) *The Confession*

The trial court denied Boggs' motion to suppress the confession he signed at 7:10 a.m. The defendant challenges the ruling on three grounds.

■ The confession, he says, was "tainted" by an unlawful arrest and search, and he concludes that it should have been suppressed as "fruit of the poisonous tree". *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963). The conclusion fails for want of proof of the predicate.

■ Next, Boggs asserts that the confession was involuntary "because he was intoxicated at the time". At the suppression hearing, Boggs testified that, during the course of the evening before his arrest, he had consumed "a six pack of beer", shared "a fifth of whiskey" with two friends, smoked marijuana, and "ate two hits of speed [amphetamines]." Although a breathalizer test showed that Boggs had a blood-alcohol content of 0.22 percent, Lonnie Penn testified that Boggs "was driving all right; fast, but all right"; Officer Cohn testified that Boggs' gait was "not unusual", his speech was "[c]lear", and "he didn't act like" he was intoxicated; and Officer Markel testified that, while Boggs smelled of alcohol and "his eyes were bloodshot, his face was flushed", his speech "did not appear to be slurred", his walk was "normal, as if he was sober", and he "appeared to be borderline DUI." Significantly, Boggs was sufficiently alert to compose and write out an exculpatory statement about the hit-and-run offense at 2:40 a.m., and when he made the confession at 7:10 a.m., approximately six hours after his arrest, he assured his interrogators that he was

sober, that he understood their questions, and that he had not been "mistreated by the police in any manner."

Statements made during a custodial interrogation and while intoxicated are not *per se* involuntary or inadmissible. *United States* v. *Brown*, 535 F.2d 424, 427 (8th Cir. 1976). The test is whether, by reason of the intoxication, the defendant's "will was overborne" or whether the statements were the "product of a rational intellect and a free will." *Townsend* v. *Sain*, 372 U.S. 293, 307 (1963).

*Yarborough* v. *Commonwealth*, 217 Va. 971, 974, 234 S.E.2d 286, 289 (1977).

■ The trial court's finding that the defendant's will was not overborne was a factual finding, entitled on appeal to the same weight as a finding by a jury, and will not be disturbed unless plainly wrong. *Witt* v. *Commonwealth*, 215 Va. 670, 674-75, 212 S.E.2d 293, 296 (1975); *accord Stockton* v. *Commonwealth*, 227 Va. 124, 140, 314 S.E.2d 371, 381 (1984) (defendant under influence of prescription drugs). The evidence summarized above is fully sufficient to support the trial court's finding.

As a third ground in support of his motion to suppress, Boggs claims that his confession was the result of a *Miranda* violation. Detective Harvey did not administer the *Miranda* warnings before he took Boggs' statement at 2:40 a.m. Although none of the questions Harvey asked during that interview was accusatory and none of Boggs' replies was inculpatory, the defendant argues that the Commonwealth failed to show "that the confession was not tainted by the first statement."

■ This question was resolved against the defendant by the Supreme Court's recent decision in *Oregon* v. *Elstad*, 105 S.Ct. 1285 (1985). There, Elstad made a statement in reply to a policeman's inquiry without benefit of *Miranda* warnings. Unlike Boggs' unwarned statement, Elstad's reply was incriminating. An hour later, the warnings were read to Elstad, and he waived his rights and made a full confession. There, as here, there was no claim of coercion. Rejecting Elstad's complaint that his confession was tainted by his first statement, the Court expressly held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."

*Id.* at 1298. We recently cited this rule in *Poyner* v. *Commonwealth*, 229 Va. 401, 409, 329 S.E.2d 815, 822 (1985).

## (3) *First-Degree Murder Count*

The third count of the indictment charged first-degree murder and, prior to arraignment, the trial court granted the Commonwealth's motion to enter a *nolle prosequi* on that count. *See* Code § 19.2-265.3. Boggs argues that "the granting of the motion was an abuse of discretion." He claims that the ruling was prejudicial because he was forced "to proceed before a jury that was not cognizant of its option to consider the evidence within the framework of a first degree murder alternative."

The "framework" in which the evidence was adduced was constructed at the time the robbery and capital murder counts of the indictment were read to the jury and the defendant entered his pleas of not guilty. The framework in which the evidence was considered by the jury was that fashioned by the instructions. Those instructions defined first-degree and second-degree murder as well as capital murder. We fail to see how the defendant was prejudiced by the *nolle prosequi.*

## (4) *Selection of the Jury*

Citing "extensive publicity", Boggs argues that the trial court erred in overruling his motions to change venue, to change venire, and to sequester the jury.

Boggs does not question the accuracy of the news accounts submitted in support of his three motions. Nor does he contend that any member of the panel of 20 from which the petit jury was chosen was unable to disregard what the news media had reported and accord him a fair trial. Rather, he seems to think that the sheer quantum of publicity infringed his right to a fair trial in his vicinage. The Supreme Court thought otherwise in *Dobbert* v. *Florida*, 432 U.S. 282, 303 (1977).

"It is presumed that a defendant can receive a fair trial in the locality where the offense occurred". *LeVasseur* v. *Commonwealth*, 225 Va. 564, 577, 304 S.E.2d 644, 651 (1983). "A motion for a change of venue or venire is addressed to the sound discretion of the trial judge, and his action in overruling the motion will not be reversed unless the record affirmatively shows that there has been an abuse of discretion." *Clanton* v. *Common-*

*wealth*, 223 Va. 41, 50, 286 S.E.2d 172, 177 (1982); *see also Washington* v. *Commonwealth*, 228 Va. 535, 544, 323 S.E.2d 577, 584 (1984).

The same rule applies to the defendant's motion to sequester the jury, for, as provided in Code § 19.2-264, "[i]n any case of a felony the jury shall not be kept together unless the court otherwise directs." *See Tuggle* v. *Commonwealth*, 228 Va. 493, 504, 323 S.E.2d 539, 545 (1984), *vacated and remanded on other grounds*, 105 S.Ct. 2315 (1985). While the trial judge declined to sequester the jury during the three-day trial, the record shows that when he dismissed the jurors for the day, he warned them to avoid news accounts of the trial and to refrain from discussing the case among themselves or with others. When they reassembled, he questioned them on the subject and all replied that they had complied with his instructions. We find no merit in these assignments of error.

Pursuing his Sixth Amendment attack, Boggs assigns error to the exclusion of three jurors. James Brabson testified on *voir dire* that he was "definitely against capital punishment" and, when asked if there were "any circumstances which would enable [him] to vote for the death penalty", he replied, "None: I'm just against it." Defense counsel asked Charlotte Boomer, "[A]re you telling us that, absolutely, you could not vote for the death penalty under any circumstances", and she answered, "Right." Yvonne Johnkins gave a similar reply to the same question.

Boggs argues that Brabson, Boomer, and Johnkins are numbered among his "peers" and that their exclusion denied him the right to a jury representing a cross-section of the community. Such an argument was recently upheld in *Grigsby* v. *Mabry*, 758 F.2d 226 (8th Cir. 1985).

Boggs overlooks two Supreme Court decisions preceding the decision in *Grigsby*. In *Adams* v. *Texas*, 448 U.S. 38 (1980), the Court, revisiting its decision in *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968),[1] said that "a juror may not be challenged for cause

---

[1] There, the Court held that prospective jurors may be excluded for cause if they make it

"unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*."

391 U.S. at 522, n.21 (emphasis in original).

based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.*" *Id.* at 45 (emphasis added). Expressly modifying the absolute standard announced in *Witherspoon,* the Court in *Wainwright* v. *Witt,* 105 S.Ct. 844 (1985), reaffirmed the *Adams* rule "as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment." *Id.* at 852.

We reject the decision in *Grigsby* and Boggs' cross-section argument based upon that case. *See Poyner,* 229 Va. at 414; 329 S.E.2d at 825. *Grigsby* is irreconcilable with the principles laid down in *Witherspoon, Adams,* and *Wainwright,* and our holding in *LeVasseur* v. *Commonwealth,* 225 Va. at 584-85, 304 S.E.2d at 654-55. *See also Briley* v. *Booker,* 746 F.2d 225 (4th Cir. 1984); *Keeten* v. *Garrison,* 742 F.2d 129 (4th Cir. 1984). Clearly, the veniremen in question were excludable under the *Adams-Wainwright* standard. Indeed, in our view their responses on *voir dire* satisfied the *Witherspoon* test.

Boggs also contends that five members of the petit jury should have been excluded for cause. Pointing to selective excerpts from the transcript of the *voir dire,* he says that four of the five thought that an accused bears the burden of proving his innocence.

Considered in isolation, the excerpts skew the import of the *voir dire* read as a whole. We look to the "entire *voir dire* rather than the single question and answer." *Fitzgerald* v. *Commonwealth,* 223 Va. 615, 628, 292 S.E.2d 798, 805 (1982), *cert. denied,* 459 U.S. 1228 (1983). Initial answers, elicited by suggestive questions, do manifest some misapprehension as to which party has the burden of proof. But the trial judge expressly instructed the panel that "the Commonwealth must prove to you that the defendant is guilty beyond a reasonable doubt" and that "[t]he defendant does not have to prove anything." Collectively and individually, the jurors promised to follow the court's instructions. And, in answer to the questions mandated by Rule 3A:14, the jurors affirmed that they had formed no "opinion as to the guilt or innocence of the accused", that they held no "bias or prejudice against . . . the accused", and that they had no reason to believe that they could not "give a fair and impartial trial to the Commonwealth and the accused based solely on the law and the evidence."

The record shows that the trial judge made a painstaking analysis of every challenge for cause. After exhaustive, individual interrogation by counsel, he excluded 12 prospective jurors, and he decided to seat these four jurors only after it was plain that they were no longer unsure which party bore the burden of proof. We find no error in that decision.

The defendant argues on brief that the trial court erred in seating a fifth juror because, he says, she "was pre-disposed to indiscriminately give the death penalty."[2] Juror Helen Allison acknowledged that she believed that "death is ordinarily the appropriate punishment" for capital murder. She explained, however, that her belief was based upon the biblical maxim, "an eye for an eye". Responding to defense counsel's question, she agreed that "[u]nder certain circumstances [she] would . . . be able to vote for life in the penitentiary as opposed to death", and she assured the court that she could comply with its instructions.

Allison's testimony was similar to that of two prospective jurors seated over challenges for cause in *Clozza* v. *Commonwealth*, 228 Va. 124, 321 S.E.2d 273 (1984), *cert. denied*, 105 S.Ct. 1233 (1985). Both gave affirmative answers when asked if they believed that death was the "appropriate" punishment in a capital murder case, and Clozza contended that they were "predisposed" in favor of that penalty. Upon review of "the entire voir dire", we found no "unalterable bias in favor of or against imposition of the extreme penalty" and, borrowing language from *Adams* v. *Texas* quoted above, we concluded that the record demonstrated that the views on capital punishment expressed by the prospective jurors would not "prevent or substantially impair the performance of their duties as jurors in accordance with the instructions of the court and their oath." *Clozza* at 128, 321 S.E.2d at 276.

The *voir dire* in this case supports the same findings, we reach the same conclusion, and we reject the defendant's argument.

## III. THE GUILT TRIAL

Boggs raises several questions concerning evidence adduced during the guilt trial, the sufficiency of the capital-murder count in the indictment, and rulings on certain instructions.

---

[2] On two occasions, the court seated veniremen over the *Commonwealth's* complaint that they were *opposed* to the death penalty.

## (1) *Evidentiary Questions*

Before the Commonwealth introduced the defendant's confession at the guilt trial, Boggs moved to strike out the sentence, "I want to kill niggers." The trial court denied the motion, and on appeal the defendant maintains that the comment should have been deleted because it was "racial in nature", "had nothing to do with the Shaw murder", and "could serve only to inflame the passions of the jury". We reject the defendant's complaint.

The ancient rule in this Commonwealth is that the prosecution has no right to introduce selected portions of a defendant's confession and exclude those which tend to mitigate, justify, or excuse the offense charged. *Brown* v. *Commonwealth*, 36 Va. (9 Leigh) 633, 634 (1838); *Parrish* v. *Commonwealth*, 81 Va. (6 Hans.) 1, 14-15 (1884); *Bowman* v. *Commonwealth*, 174 Va. 461, 463-64, 5 S.E.2d 497, 498-99 (1939). We hold that, because it appears from the totality of the circumstances in this case that Boggs' confession is the "product of an essentially free and unconstrained choice by its maker", *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973), he cannot be heard to complain that something he said might inflame the passions of the jury, especially since his statement was volunteered and unresponsive to any question propounded.

The robbery indictment charged Boggs with the theft of "assorted silverware and flatware", and the evidence conclusively establishes his guilt of that offense. The indictment did not mention jewelry, and for that reason, Boggs assigns error to the admission of a ring which, he says, "was never linked to the defendant."

It is true that Mark Smith could not be certain that this ring was the one Boggs had given him to pawn. Mrs. Shaw's daughter, however, identified it positively as the ring her mother was wearing the morning of the day she was killed and missing from her finger when the body was found. The evidence was clearly competent to corroborate Boggs' confession that he had removed Mrs. Shaw's rings from her fingers.

Boggs contends that the trial court should have excluded decedent's clothing which the Commonwealth introduced as an exhibit. We disagree. Detective J. R. Murray had conducted certain tests on Mrs. Shaw's blouse and pants, and defense counsel conceded at trial that "the clothing items would be a necessary link in those tests" if introduced for that purpose. While, as the

defendant says, the exhibit was largely cumulative, it was not irrelevant, and we find no reversible error in the trial court's ruling.

■ Over the defendant's objection, the trial court admitted a number of photographs of Mrs. Shaw's body and the scene of the crime, and Boggs argues on appeal that they "were introduced merely to inflame the jury." We believe the evidence was properly admitted.

> We have held repeatedly that the admissibility of photographs depicting the body of a murder victim is a matter within the sound discretion of the trial court. *See Washington* v. *Commonwealth*, 228 Va. 535, 323 S.E.2d 577 (1984); *Clozza* v. *Commonwealth*, 228 Va. 124, 135, 321 S.E.2d 273, 280 (1984); *Stockton* v. *Commonwealth*, 227 Va. at 144, 314 S.E.2d at 384. Such pictures are relevant in the guilt trial to show premeditation and malice and, in the penalty trial, to illustrate the nature and degree of the vileness of the crime. Here, the pictures were as "graphic" as those in *Stockton*, 227 Va. at 144, 314 S.E.2d at 384; as "gruesome" as those in *Whitley* v. *Commonwealth*, 223 Va. 66, 74, 286 S.E.2d 162, 167, *cert. denied*, 459 U.S. 882 (1982); and as "hideous and grotesque" as those in *Waye* v. *Commonwealth*, 219 Va. at 692, 251 S.E.2d at 207, but "no more inflammatory than the medical testimony detailing the results of the autopsy", *Smith* v. *Commonwealth*, 219 Va. at 468, 248 S.E.2d at 143.

*Jones* v. *Commonwealth*, 228 Va. 427, 450, 323 S.E.2d 554, 566-67 (1984).

■ Boggs maintains that the trial court erred in overruling his motions for mistrial at the conclusion of the testimony of two witnesses for the Commonwealth.

Leon Rawls testified that Boggs had told him six months before the crime that "he had been planning on a job" and that three days after the robbery, "he showed me . . . a wedding band" and "asked if I would hold some silver." The Commonwealth displayed a wedding band and Rawls said that "it looks like the ring Boggs showed me." Rawls admitted that he had been drinking liquor and smoking marijuana with a group of friends at his home and that he "had a buzz" during the conversation with Boggs.

Boggs contends that Rawls "couldn't identify the wedding band" and that his testimony was "unreliable and sordid" and "tainted the defendant by his description of his lifestyle". We do not consider such a complaint grounds for a mistrial; Rawls' testimony was highly relevant and admissible for such weight as the jury cared to give it.

Sam Gay, Jr., who took custody of Mrs. Shaw's body and transported it to the crime laboratory, was asked when he took the stand to state his occupation. When Gay identified himself as a licensed undertaker, Boggs moved for a mistrial on the ground that the nature of the witness' occupation was irrelevant and raised "all sorts of . . . needless impressions in the minds of the jurors."

Gay's testimony was offered and admitted to establish the integrity of the chain of custody of the body awaiting the autopsy. The jurors were aware that Mrs. Shaw was dead and that the services of an undertaker were required, and we fail to see how the defendant was prejudiced by the identification of the occupation of the custodian of the corpse.

### (2) *Sufficiency of the Indictment*

At the conclusion of the evidence adduced at the guilt trial, Boggs asked the trial court to rule that the first count of the indictment "does not charge the defendant with capital murder."

On brief, the defendant says that, in the indictment, "[t]he words 'while armed with a deadly weapon' modify the act of robbery and not the act of murder." He reasons, then, that the indictment "alleged, at best, murder in the first degree, and not capital murder." We cannot accept such a strained construction of the language. "An indictment need not be drafted in the exact words of the applicable statute so long as the accused is given notice of the nature and character of the offense charged." *Black* v. *Commonwealth*, 223 Va. 277, 282, 288 S.E.2d 449, 451 (1982). *See* Code § 19.2-220; Rule 3A:6.

The indictment, inartfully drafted as it was, expressly referenced Code §§ 18.2-31 and 18.2-58, and we hold that the accused could not reasonably have mistaken the nature and character of the offenses with which he was charged. Indeed, he implicitly acknowledged fair notice at the pre-trial hearings when he moved to quash the indictment, assigning only challenges to the facial constitutionality of the capital statutes.

### (3) *Jury Instructions*

■ Boggs assigns error to three instructions granted over his objections. Instruction 1 defined capital murder and Instructions 6 and 9 pertained to the robbery charge. Boggs' complaint in this Court is based upon his premise that the indictment was defective. We have rejected that premise, and we find no error in the content of the instructions.

■ The trial court refused two instructions offered by the defendant at the guilt trial. Instruction 1-A advised the jury that "if you find [Boggs] guilty of capital murder, you cannot find him guilty of robbery." The defendant cites *Johnson v. Commonwealth*, 221 Va. 736, 273 S.E.2d 784 (1981), as authority for that instruction. There, a similar instruction had been given in the first of two capital murder-robbery trials, and Johnson was convicted of the capital offense but not of the underlying robbery charge. Although we reversed the conviction on other grounds, the propriety of the instruction was never in issue. *Johnson v. Commonwealth*, 220 Va. 146, 255 S.E.2d 525 (1979). At the second trial, Johnson was convicted of both offenses. On appeal from those convictions, the only issue was whether a second "prosecution for capital murder in the commission of armed robbery was barred by the doctrines of collateral estoppel, double jeopardy, and autrefois acquit". *Johnson*, 221 Va. at 738, 273 S.E.2d at 785-86. While we affirmed the two convictions, we had no occasion to analyze, and contrary to Boggs' reading of our opinion, we did not approve the instruction given in the first capital trial.

In a case decided subsequent to the second appeal in *Johnson*, we sustained a trial court's decision that an accused can be lawfully convicted of both capital murder-robbery and robbery when the offenses are prosecuted in a single trial. *Fitzgerald v. Commonwealth*, 223 Va. 615, 634-37, 292 S.E.2d 798, 809-11 (1982), *cert. denied*, 459 U.S. 1228 (1983). Accordingly, Instruction 1-A was not a correct statement of the law and was properly refused.

The trial court also refused Instruction 2-A, a felony-murder instruction offered by the defendant. There was no error in this ruling. Instruction 2, a first-degree murder instruction, correctly defined both premeditated murder and felony-murder. Nor did the trial court err in refusing penalty Instructions B-1 and D-1; both were fairly comprehended by other instructions.

## IV. THE PENALTY TRIAL

The jury rested the death penalty upon the "aggravated-battery" component of the "vileness" predicate. *See* Code § 19.2-264.2. Boggs argues that "there was no aggravated battery"; that "[t]he death sentence was imposed under the influence of passion, prejudice or . . . other arbitrary factors", *see* Code § 17-110.1(C)(1); and that "the death penalty was disproportionate and excessive when compared to other cases in which the death penalty was imposed", *see* Code § 17-110.1(C)(2).

### (1) *Aggravated Battery*

Boggs argues that, because there was "no evidence that [Mrs. Shaw] regained consciousness" after the initial blow to her head and "the first blow would have resulted in death", the evidence does not support the requisite finding of "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979).

For purposes of the "vileness" determination, it is immaterial whether the decedent remained conscious during the course of several assaults. *See Jones* v. *Commonwealth*, 228 Va. 427, 447-48, 323 S.E.2d 554, 565 (1984). The number or nature of the batteries inflicted upon the victim is the essence of the test whether the defendant's conduct "was outrageously or wantonly vile, horrible or inhuman in that it involved . . . an aggravated battery." Code § 19.2-264.2.

The defendant's confession and the testimony of the medical examiner show that Mrs. Shaw was struck in the head with a metal bar, not once but six times, and in the neck several times; that she was still alive while Boggs searched for her valuables; that she was stabbed in two places with a long knife which had been partially withdrawn and re-thrust at least three times; and that she did not die until the knife sliced the front wall of her heart. It is difficult to imagine evidence which better satisfies the definition of an aggravated battery.

### (2) *Passion or Prejudice*

Boggs believes that the jury failed to consider "all of the mitigating factors presented by the defendant, his father and the psy-

chiatrist." He also argues that, while the errors assigned "may be considered harmless when considered separately . . . when compounded, the errors constitute severe and indelible impressions which lead to the sentence of death." He asks us, therefore, to hold that the sentence was imposed under the influence of passion, prejudice, or other arbitrary factors and to commute his sentence to imprisonment for life. *See* Code § 17-110.1(D)(2).

The trial court instructed the jury to consider all evidence adduced at the penalty trial, the written verdict expressly recited that the jurors had "considered the evidence in mitigation of the offense", and the defendant's assertion that they had not done so is merely conclusory. Moreover, since we have determined that there was no error in the conduct of the guilt trial or the finding of an aggravated battery, there is no foundation for the defendant's cumulative-effect argument. *See Waye* v. *Commonwealth*, 219 Va. 683, 704, 251 S.E.2d 202, 214, *cert. denied*, 442 U.S. 924 (1979).

Boggs suggests nothing further to support his claim that the death penalty was the product of passion or prejudice, we find nothing of record, and we reject his complaint.

### (3) *Propriety of the Sentence*

In support of his contention that his sentence in the capital case was excessive or disproportionate to the penalty imposed in other cases, Boggs cites a number of our opinions which, he says, "involve circumstances which are far more shocking and cruel than the evidence in the case at bar."

That may be. But the legislature did not limit the disproportionality review to cases chosen selectively. Our comparison extends to the records in all the capital cases presented to this Court, including those in which the trial court imposed a penalty of imprisonment for life. Because we are directed by Code § 17-110.1(C)(2) to compare "similar" cases, we give special attention to those in which the underlying felony, the penalty predicate, and the facts and circumstances surrounding the commission of the crime are fairly comparable. Understandably, we have found no case identical in all particulars with Boggs' case. But, from our analysis of the cases in which the death penalty was based, as it was here, solely on the vileness predicate, *see Jones* v. *Commonwealth*, 228 Va. 427, 450-51, n.3, 323 S.E.2d 554, 567 (1984) (collecting and annotating cases), and *Washington* v. *Commonwealth*, 228 Va.

535, 323 S.E.2d 577 (1984), we confidently conclude that "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980).

We find no reversible error in the conduct of the defendant's trial and no reason to commute the sentence of death, and we will affirm the judgments entered below.

*Affirmed.*