## Norfolk

EUGENE HOGAN, a/k/a

NIGEL JAMES COLON

v.

COMMONWEALTH OF VIRGINIA

No. 0362-90-1

Decided November 24, 1992

COUNSEL

J. Roger Griffin, Jr. (Chris A. Christie; Christie, Held & Kantor, on brief), for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**BAKER, J.**—Eugene Hogan (appellant) appeals from his bench trial convictions by the Circuit Court of the City of Virginia Beach (trial court) for possession of cocaine and possession of cocaine with intent to distribute. The possession charge resulted from appellant's arrest on January 14, 1989, and the intent to distribute charge occurred on May 5, 1989. The facts of each charge will be stated separately and in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible from the evidence. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

## I. THE JANUARY ARREST

On January 14, 1989, Virginia Beach Police Officer D.M. Brown observed appellant drive a two-door Chevrolet through a red light at the intersection of Independence Boulevard and Baxter Road in the City of Virginia Beach. Brown activated his blue light and siren, and

pursued appellant onto Route 44, where Brown overtook and stopped appellant. No passengers were in appellant's car.

When asked for his driver's license and other identification, appellant told Brown he had none. When asked his name, appellant replied that it was Nigel James Colon; however, he produced a registration card for the vehicle which disclosed that it was registered to Eugene Hogan.

Brown placed appellant in his police car and ran a license check on Nigel Colon and found that the name was not on file. For approximately one-half hour, Brown attempted to convince appellant to give him his correct name. Notwithstanding Brown's admonishment that he would have to take appellant before a magistrate if he did not correctly identify himself, appellant refused to reveal his true name. Brown then called for a truck to tow appellant's car and proceeded to inventory its contents.

From outside appellant's vehicle, in plain view, Brown observed two white plastic bags which contained a powdery material that appeared to him to be an "illegal substance." He took the bags into his custody and concluded his inventory consisting of some papers found in the glove compartment, a bloody towel in the trunk and a spare tire. The white substance was sent to a laboratory and determined to be cocaine.

Appellant alleges that the trial court erred when it failed to suppress the cocaine. We disagree. The cocaine was observed in plain view after Brown had made a lawful stop. Brown had probable cause to believe that the material seen in plain view was contraband. *See Harris v. Commonwealth*, 241 Va. 146, 152-54, 400 S.E.2d 191, 195-96 (1991); *Horton v. California*, 496 U.S. 128, 133-37 (1990); *Texas v. Brown*, 460 U.S. 730, 735-44 (1983). Because the contraband was lawfully seized in plain view, we affirm the trial court and need not address appellant's argument relating to the inventory search.

## II. THE MAY ARREST

In his appeal for conviction of possession of cocaine with the intent to distribute, arising out of his arrest on May 5, 1989, appellant contends: (1) the evidence seized by the Virginia Beach Police Department during the warrantless search of his automobile should have been suppressed as the fruits of an invalid inventory search; and (2)

police officers unlawfully forced open locked containers during a warrantless search.

We state the facts in the sequence of their occurrence. On May 5, 1989, at approximately 1:25 a.m., Virginia Beach Police Officer Mark Kuehn responded to a call which advised him that a clerk at the College Park Shopping Center Exxon station had received a threatening telephone call. When Kuehn arrived at the station, the caller was still on the line and asked the clerk, "What are you trying to do? Get a cop killed?" Kuehn took the telephone receiver, advised the caller that he was a police officer and that threatening telephone calls and threats to kill police officers were illegal. The caller responded with "a few obscene statements" and repeated the threat to Kuehn. The caller then asked Kuehn to meet him at the "A & N in regards to some of his threats." From talking with the caller, Kuehn concluded "that he was a young, black male with a soft basic voice."

Kuehn sent a message requesting that Police Officer Joel Davis meet him at the A & N store that was located in the shopping center adjacent to the Exxon station. Davis arrived prior to Kuehn and saw appellant, a young black male, sitting in his car in the parking lot of a Western Auto store, which was close to an outdoor pay telephone and within line of sight of the Exxon station. There were no other persons in the shopping area.

Davis approached appellant to determine whether he had a legitimate reason for being parked in the Western Auto lot at approximately 1:30 a.m., and to ascertain whether he might be the suspect in the threatening call incident. When Davis asked for appellant's license and registration card, appellant produced it. Appellant then voluntarily told Davis that he was there because his car had broken down and that he was waiting for someone to "pick him up." Appellant got out of his car and raised its hood to show Davis where a hose had broken. Davis saw steam rising from the motor area.

Upon observing that appellant had a cellular telephone in his car, Davis told appellant why the police were there. Appellant appeared "extremely nervous." As Davis started to return to his car to call in to determine the status of appellant's license and whether there were any outstanding warrants for his arrest, appellant's car telephone rang. At first, appellant did not answer it but after being prodded by Davis, appellant went to the phone, said a few words and hung up. Appellant then disconnected the car telephone.

Davis returned to his car to complete the check and found that appellant's license was suspended. Davis was unable to complete the warrant check because the computer system was inoperable. As Davis was requesting the dispatcher to run a warrant check on appellant, Kuehn arrived at the scene. Kuehn told Davis that appellant's voice sounded like that of the caller. Because no other person was in the shopping center and appellant, in line sight of the Exxon station, was sitting next to a car phone and near a pay phone, together with the similarity of appellant's voice to that of the person who made the threatening call, Davis suspected that appellant was the caller who made the threats.

Davis proceeded with his investigation relative to the threat and asked appellant to step out of the car. Believing that appellant might be the criminal agent, Davis feared for his safety and conducted a pat-down search of appellant for guns, knives or anything that could be used against the officers. He found a beeper pager, a motel room key and between five and six thousand dollars packaged in $500 increments. He described the packages as hard and about the size of a pistol. He also testified that there are "beeper guns" which look like a beeper but are actually automatic weapons from which a shot can be fired by pushing a button.

Appellant first explained the motel key by saying he was staying at a motel because he could not get along with his parents. He changed that account when the money was found, saying his parents had died and left him the money and that he was executor of their estates. Neither statement was true.

Fearing that if appellant was the caller he may have had weapons in his car, Davis handcuffed him, placed him in a police car and explained that he was not being arrested but was "undergoing investigative detention." Appellant did not object, providing he was not being arrested. The officers continued their protective search for their safety and began to "frisk" appellant's car, examining only the areas "accessible from the driver's seat" such as "under the seat, in the glove box and in the console." On the back seat of the car, they found a typewriter case and a briefcase. They removed these items from the car and opened the typewriter case which was not locked. Inside they found a set of electronic scales. They retained the briefcase which was locked, but did not attempt at that time to open it.

The dispatcher was again contacted. He advised the officers that there was an outstanding warrant for appellant's arrest. Pursuant to that warrant, appellant was arrested. The officers reported the "situation" to their supervisor. In response, Detective Batten of the special investigating unit (SIU) was sent to the scene and took charge of the investigation. The items found by the personal search of appellant and taken from appellant's car following the protective search were turned over to Batten. Batten then transported appellant, and the items he had taken into his custody, to police headquarters.

Because appellant had been taken into custody, in accord with established Virginia Beach Police Department policy, appellant's car was towed for safekeeping. Prior to its being towed, an inventory of its contents "of obvious value" was made and the car was released to the tow truck driver. The only article of "obvious value" remaining in the car was the cellular telephone. As noted, the other items found during the protective search already had been turned over to the SIU officer and transported to police headquarters.

In furtherance of its standardized policy, the Virginia Beach Police Department created a form entitled "Property Clerk's Voucher" for use in recording property taken pursuant to the arrest of an accused. The form is used both to list items that are taken by the tow truck driver and those to be used as evidence in a potential prosecution. It contains two small square boxes in which check marks are placed to indicate whether the property is listed as merely "inventory" or listed as "evidence" retained by the police to be used at trial. The inventory box was marked and only appellant's car description and the cellular telephone were listed. The form also included Davis' signature. Davis testified that in addition to the form he signed, another form was prepared which listed the items Batten had taken as evidence. He added that the properties being held as evidence were "vouched" separately, but using the same type "Property Clerk's Voucher." Kuehn added that the cash, beeper, scales, briefcase and "stuff" taken from appellant's possession were turned over to the SIU.

Counsel stipulated that when the briefcase was taken to police headquarters, a trained narcotics dog alerted on the case, whereupon the police broke open the case and found the illegal drugs.

The initial question presented to the trial court and on this appeal is whether the evidence seized by the Virginia Beach police department during the warrantless search of appellant's automobile should have

been suppressed as fruits of an invalid inventory search. We hold that the record does not support the assertion that evidence was obtained by the police as a result of an invalid search.

By telephone, at approximately 1:30 a.m., a young person with a soft, male voice threatened to harm an Exxon station clerk and kill a police officer. A few minutes after the threat was made, appellant was found parked in his car opposite a telephone booth in line sight of where the clerk and officer had received the threats. At the time, appellant was sitting next to a cellular telephone, which the evidence shows was working. No other person was in the area. Although appellant explained that his car was broken, he did not say why he had come to a shopping center at that time of morning. The steaming car indicated his recent arrival. Appellant's voice sounded to the threatened officer to be like the voice of the caller who made the threat. Under the circumstances, for their safety, a pat-down search of appellant's person was reasonable. The search discovered a beeper of the type frequently used by drug dealers and an unusually large amount of cash. Appellant lied when asked to explain the motel key and cash. No explanation was made concerning the beeper. The police had ample reason to suspect that there might be weapons in appellant's car and the limited search initially made for that purpose was reasonable. The discovery of the electronic scales together with the cash, beeper, motel key, appellant's lies and the place where appellant was found at 1:25 a.m. were sufficient to cause the police to further suspect other criminal activity was afoot; however, the officers continued to investigate the threat to kill a police officer. Although the defense attempted to present drugs as the primary reason for the police activity, as if it were the major crime, killing a police officer is a capital offense far more serious than appellant's drug activity. The officers clearly stated that their primary purpose was to continue the threat investigation. The record supports the officers' contention.

Initially, no search of the trunk or other non-accessible areas was conducted. The police had reason to suspect appellant was the caller who made the threats and had further reason to assure their own safety. The fact that evidence of other possible criminal activity was found in appellant's possession does not discredit the lawful search of appellant's car for weapons. Appellant's claim that the limited search for weapons was pretextual and made in bad faith is not supported by the record. Nothing in the record discloses that the protective searches were unreasonable searches, in violation of the Fourth Amendment,

which should invoke the exclusionary rule. *See Illinois v. Lafayette*, 462 U.S. 640 (1983) (where an inventory search of the contents of a shoulder bag in possession of an individual being taken into custody was held to serve legitimate governmental interest as declared in *South Dakota v. Opperman*, 428 U.S. 364 (1976)). It was during the search for weapons that the typewriter case that housed the electronic scales and briefcase that secreted the cocaine were found. It was on appellant's person that the beeper, an instrument frequently used in the drug trade, and large amounts of cash were found, both also as a result of the pat-down protective search. The exercise of the inventory policy had no relationship to the discovery of the evidence appellant seeks to have suppressed. No challenge is made to the protective searches made of his person or his automobile. Appellant does not argue that he was illegally detained. When the detention of the suspect is valid, such protective searches have long been held to comply with constitutional requirements. *See Michigan v. Long*, 463 U.S. 1032 (1983).

Appellant does not contend that the protective search of his car was unlawful,[1] nor does he contend that he was unlawfully stopped, detained, frisked, arrested or personally searched. He predicates his argument on an allegation that the inventory search was made in bad faith and only as a pretext to a drug investigation. Thus, he asserts that the inventory search made after his arrest was invalid, requiring that the "fruits" thereof (evidence of the scales and cocaine) be suppressed pursuant to exclusionary rule. We do not agree with his assertion.

After the officers assured their safety, and while still at the scene of appellant's arrest, they learned from a police dispatcher that there was an outstanding warrant for appellant's arrest. They arrested appellant, impounded his car and immediately called for a member of the SIU, who responded and took charge of the investigation and evidence subsequently used in the prosecution from which this appeal emanates.

---

[1] The dissent observes that while appellant was handcuffed and in the police car, there was no need to frisk appellant's car for weapons. We perceive this to be no more a prohibition to making a protective search of the car than there would have been if appellant were directed to stand aside and watched by one of the officers while the other conducted the weapons search. Moreover, we must view the events as confronted by the police on the scene, not from the distance we are able to consider them. The "investigative detention" here is supported by articulated reasonable suspicion that criminal activity may have been afoot. *See Terry v. Ohio*, 392 U.S. 1, 23 (1968); *Landsdown v. Commonwealth*, 226 Va. 204, 210, 308 S.E.2d 106, 110 (1983), *cert. denied*, 465 U.S. 1104 (1984).

Following the policy established by the Virginia Beach Police Department after the arrest and impoundment of appellant's car, Davis and Kuehn conducted an inventory search of the car. The only item of obvious value remaining in the car was the cellular telephone.

■ Appellant argues that because the inventory listed by Davis contained only references to the car and the cellular telephone, and did not include the remaining items taken into custody, the inventory search was invalid. The officers explained that the tow truck driver was given only the items listed on their inventory and, therefore, could not be expected to sign for the remaining items which were listed on the same type form prepared by the SIU officers, who referenced them as evidence. It is the "totality of the circumstances — the whole picture" that must be viewed in assessing the validity of the police action. *See United States v. Cortez*, 449 U.S. 411, 417 (1981); *Leeth v. Commonwealth*, 223 Va. 335, 340, 288 S.E.2d 475, 478 (1982). We find that, when viewing the "whole picture," the police did not act in bad faith or with a pretextual motive.

■ Appellant concedes that warrantless inventory searches are exceptions to the Fourth Amendment. *See Cooper v. California*, 386 U.S. 58 (1967); *South Dakota v. Opperman*, 428 U.S. 364 (1976); *Colorado v. Bertine*, 479 U.S. 367 (1987); *Hamby v. Commonwealth*, 222 Va. 257, 279 S.E.2d 163 (1981). Contraband or other evidence of crime discovered in an inventory search may be seized without a warrant and introduced into evidence at trial. *Reese v. Commonwealth*, 220 Va. 1035, 1039, 265 S.E.2d 746, 749 (1980). As in *Reese*, appellant here does not deny that his car was lawfully impounded.

Generally, such a car may be searched, as a matter of standard procedure, without a warrant in order to inventory its contents. This exception to the Fourth Amendment's warrant requirement is based upon the need to protect the owner's property, to protect the police against claims of lost or stolen property, *to protect the police from physical danger, and to protect the public from dangerous instrumentalities or substances that may be pilfered from an impounded vehicle.* Because inventories promote such important interests and, not being investigatory in purpose, do not implicate "the interests which are protected when searches are conditioned on warrants", inventory searches are not "unreasonable" within the meaning of the Fourth Amendment.

*Id.* (citations omitted) (emphasis added).

■ In *Lafayette*, a warrantless search made at the jailhouse for inventory purposes was held valid. In *Bertine*, involving an automobile search, the Court specifically held that such searches serve legitimate governmental purposes and do not require warrants prior to viewing the contents of containers found in the vehicle. *Bertine*, 479 U.S. at 372-73.

[T]he real question is not what "could have been achieved," but whether the Fourth Amendment requires such steps. . . .

The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative "less intrusive" means.

*Id.* at 374 (citations omitted). The Court then added:

"Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit."

"When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of vehicle, must give way to the interest in the prompt and efficient completion of the task at hand."

We reaffirm these principles here: " '[a]single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.' "

*Id.* at 375 (citations omitted). There was no showing that the police here made the protective weapons search for any reason other than their personal safety. The arrest of appellant was made at the scene pursuant to a valid outstanding arrest warrant. There is nothing in the record to show that the police impounded appellant's car or made the inventory search in bad faith. Likewise, nothing in the record establishes that the Virginia Beach Police Department acted contrary

to standardized procedure or contrary to the requirements of *Florida v. Wells*, 495 U.S. 1 (1990).

██ Appellant next asserts that the warrantless search of the briefcase at police headquarters was made in violation of the Fourth Amendment. The search of a closed container, discovered in the course of a legitimate inventory search of the contents of a motor vehicle in lawful police custody, is not unreasonable under the Fourth Amendment. *See Boggs v. Commonwealth*, 229 Va. 501, 331 S.E.2d 407, *cert. denied*, 475 U.S. 1031 (1986), (1985); *Hamby*, 222 Va. 257, 279 S.E.2d 163. "[I]f the basis behind the inventory search is to protect any valuables which might be present, it is illogical to prohibit law enforcement officials from searching those areas wherein valuables are more likely to be kept." *Hamby*, 222 Va. at 261, 279 S.E.2d at 166. If the basis for the protective search is to protect the police from possible harm, it is equally illogical to prohibit them from searching areas where weapons may be concealed.

As aforenoted, appellant made no challenge to the protective search, and we have declined to accept his assertion of bad faith on the part of the police. The trial court heard the evidence, observed the witnesses and concluded that the officers acted in good faith and with sufficient reason. The evidence supports the trial court's judgment on that issue and we cannot say it is plainly wrong.

Having disagreed with appellant's bad faith argument, we must determine whether the right to search the briefcase at the scene carried over and allowed the police to conduct the search at police headquarters. Appellant does not challenge the right of the police to make the warrantless protective search. He concedes that his arrest was validly made pursuant to the outstanding arrest warrant and that a warrantless inventory search made in good faith does not violate the provisions of the Fourth Amendment. He questions the validity of the warrantless entry into the briefcase at police headquarters. The police, after appellant's arrest and the impoundment of his car, not only had the right but were required to make the inventory search. The right to look inside the briefcase at the arrest scene was not lost by the transfer of the briefcase to police headquarters.

In *United States v. Johns*, 469 U.S. 478 (1985), the United States Supreme Court held that where a vehicle containing concealed contraband was searched three days later in a warehouse without a warrant,

no Fourth Amendment violation occurred. In that case, the Court noted that the police had probable cause to believe the vehicle contained drugs; therefore, the search was lawful. We perceive no difference in the *Johns* case and the one before us where the items were recovered during an inventory search or a lawful protective search. The justification to conduct a warrantless search does not vanish once the car has been immobilized. *Johns*, 469 U.S. at 483. Moreover, in the case before us, the police were authorized by the outstanding warrant to arrest appellant and were required to take custody of the items found during the search. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Even though the police did not have probable cause, a warrantless search of the trunk of an automobile for weapons was upheld as a "protective search" solely because the police "were under the impression" there may have been a weapon in the car.[2] *See Cady v. Dombrowski*, 413 U.S. 433, 436 (1973) (cited with approval in *Opperman*, 428 U.S. at 374 (1976)). *See also Long*, 463 U.S. 1032 (1983). In *Cady*, the Court held that the safety of the general public who might be endangered justified the warrantless search. 413 U.S. at 447. For the same reason, the search for weapons for police protection in the case before us was reasonable and involved no infringement on appellant's constitutional rights. As in *Cady*, here there is no credible evidence to support a finding that the officers' action in exercising control over the briefcase was unwarranted.

In the case before us, appellant was lawfully arrested and taken to police headquarters. Detective Batten, who took appellant into custody, also transported the briefcase. At the scene of appellant's arrest, the police could have made a warrantless entry into the briefcase and this right was not lost by the change of location or by the fact that the trained narcotics canine alerted on the briefcase.

■ We are constantly reminded by the decisions of the United States and Virginia Supreme Courts that the Fourth Amendment prohibits only unreasonable searches and seizures. *See, e.g., Desist v. United States*, 394 U.S. 244, 254 n.23 (1969); *Warren v. Commonwealth*, 214 Va. 600, 602, 202 S.E.2d 885, 887 (1974). The record discloses that the searches conducted by the police were reasonable and did not violate the provisions of the United States Constitution.

---

[2] Bloody evidence relating to a homicide was found in the trunk and used at trial. The Court affirmed a conviction.

For the reasons stated, the judgments of the trial court are affirmed.

*Affirmed.*

Willis, J., concurred.

Benton, J., concurring in part and dissenting in part.

I concur in Part I of the opinion and would uphold the conviction of Eugene Hogan for possession of cocaine on January 14, 1989. However, I dissent from Part II because I would hold that the search of Eugene Hogan's vehicle on May 5, 1989, was unlawful.

Although Hogan does not challenge on this appeal the stop, frisk, or detention to which he was subjected on May 5, 1989, he challenges the search of his vehicle conducted after he was frisked, handcuffed, and detained in the police vehicle. When the police searched Hogan's vehicle, they had not arrested Hogan and had, at that time, no known reason to arrest him. The officer testified as follows:

> I handcuffed him for my safety and Officer Kuehn's safety, and I told him that he was not under arrest at this point. He was undergoing investigative detention; and he was not under arrest. . . . Then I placed him in the back seat of my car, and Officer Kuehn and I went back up and frisked his car for weapons.

After the search of Hogan's vehicle, the officer was advised that Hogan was wanted, and the officer "then immediately placed him under arrest for failure to appear in court."

No evidence supports the warrantless search of Hogan's vehicle.The police are not empowered to make an inventory search predicated solely upon the detention of the vehicle's owner. *See Colorado v. Bertine*, 479 U.S. 367, 375 (1987). The police also are not permitted to "conduct automobile searches *whenever* they conduct an investigative stop[.]" *Michigan v. Long*, 463 U.S. 1032, 1050 n.14 (1983) (emphasis in original). *See also State v. Brown*, 63 Ohio St. 2d 349, 588 N.E.2d 113 (1992). The police may search an automobile during an investigatory stop only "if the police officer possesses a reasonable belief based on, 'specific and articulable facts which, taken together with the rational inference from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049.

[P]art of the reason to allow area searches incident to an arrest is that the arrestee, who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity. This recognition applies as well in the *Terry* context. However, because the interest in collecting and preserving evidence is not present in the *Terry* context, we require that officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry*.

*Id.* at 1050 n.14.

In this case, the police had no reasonable basis to suspect that Hogan was the person who had called and threatened the gas station attendant. Hogan was seated in his vehicle parked in the vicinity of a public telephone. These facts, standing alone, did not furnish reasonable suspicion that Hogan had made the threatening telephone call. Indeed, the police saw the steam coming from the vehicle's radiator and saw the broken pipe, objective verification that Hogan was at that place because his vehicle was disabled. While Hogan does not challenge the validity of the initial stop and detention, we are asked to address the validity of the investigatory search of his vehicle, conducted immediately after the police frisked, handcuffed, and detained Hogan. That search of Hogan's vehicle was impermissible.

*Long* does not create a *per se* rule that a vehicle's passenger compartment may be searched in the course of every investigatory stop. Before conducting a search, the police must have "specific" and articulable facts "[that] reasonably warrant" a belief that the detained person is armed and dangerous. 463 U.S. at 1049. The police may not simply rely upon the fact that a detainee who is not arrested will eventually return to the vehicle. In *United States v. Powless*, 546 F.2d 792 (8th Cir.), *cert. denied*, 430 U.S. 910 (1977), cited with approval by the *Long* majority, the police did not initiate a search of the vehicle until sighting the butt of a gun on the floor of the vehicle while reading its VIN number. *Id.* at 794. This sighting of a weapon in plain view was buttressed by other information, including a state police report that the occupants of the vehicle were considered armed and dangerous. *Id.* at 794-95. These facts, viewed *in toto*, provided the police in that case with a reasonable basis to search the vehicle and seize the weapon. *Id.* at 795.

"Officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry.*" *Long*, 463 U.S. at 1050 n.14. The police may not search a vehicle solely because an individual who has been subjected to an investigatory stop might reenter. Rather, *Long* requires a discrete assessment of present and potential danger. In *Powless*, discovery of the rifle in plain view along with the police radio report that the occupants were armed and dangerous supported the reasonableness of the search. *Powless*, 546 F.2d at 795. In *Long*, the observation of a large knife in the automobile just as Long, who was standing very close to the automobile, prepared to reenter supported the search. *Long*, 436 U.S. at 1050. A search of a vehicle was also upheld in *United States v. Jackson*, 918 F.2d 236 (1st Cir. 1990), because the police knew that Jackson, a convicted felon, had been seen conducting two drug transactions while in possession of a firearm. *Id.* at 239-40. When an investigatory search of Jackson's person failed to reveal a weapon, the police were justified in making an investigatory search of the car in which he was a passenger at the time of the investigatory stop. *Id.* In those cases, the facts strongly indicated that a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

In this case, Hogan was handcuffed and seated in the back of the police car at the time of the search. One of the officers peered into Hogan's vehicle and saw nothing more dangerous than a car phone inside the vehicle. The record contains no articulable facts to support a conclusion that Hogan was armed or dangerous. The police had no prior knowledge of a firearm being seen in Hogan's possession, and the police had no independent basis for believing Hogan's vehicle might contain a weapon. The majority simply assumes without explanation that because the police frisked Hogan, they had a lawful basis to search Hogan's vehicle.

The testimony also raises the existence of a pretextual motive for the initial search of the automobile. While frisking Hogan for weapons, the officer found a hotel room key and a large sum of cash. These discoveries caused him to suspect that Hogan was involved with "[d]rugs or other types of illegal activities . . . [s]elling stolen property. Receiving stolen property." The officer then explained to Hogan that he was not under arrest, but under "investigative detention" as he handcuffed Hogan and placed him in the backseat of the police cruiser

and proceeded to search the automobile. The officer testified that after he became aware of the money, the beeper and the car phone, his primary interest, prior to his search of the vehicle, was in the possibility of Hogan's involvement in drug activity. "Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). *See also United States v. Lott*, 870 F.2d 778, 785 (1st Cir. 1989) (where evidence found by officers when they "frisked" the car should have been suppressed because the search was for contraband as well as weapons).

For these reasons, the police exceeded the scope of a permissible investigatory search. Accordingly, I would reverse the conviction arising out of the May arrest.