COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Judges Ortiz, Raphael and White
Argued by videoconference


SHJON MICHAEL STAMPS

                                                    OPINION BY
v.        Record No. 0259-24-1          JUDGE STUART A. RAPHAEL
                                              FEBRUARY 18, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge[1]

Roger A. Whitus (Slipow & Robusto P.C., on brief), for appellant.

Rebecca Johnson Hickey, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Appealing his conviction for possessing a Schedule I or II controlled substance with

intent to distribute, Shjon Michael Stamps claims that the trial court should have suppressed the

evidence as the fruit of an unlawful inventory search. Stamps was pulled over on Interstate 264

when the police determined that his license plates did not match the car he was driving.

Although his driver's license had expired and his car lacked a valid registration and

safety-inspection sticker, Stamps claims that the police should not have impounded his car but

should have allowed someone else to drive it away. He also argues that the police failed to

follow their own inventory-search procedures and used the inventory search as a pretext to

conduct a criminal investigation.

---

[1] Judge A. Bonwill Shockley ruled on Stamps's motion to suppress, the subject of this
appeal. Judge James C. Lewis accepted Stamps's conditional guilty plea and presided over his
sentencing.

But viewing the evidence in the light most favorable to the Commonwealth, the prevailing party below, we find that it was objectively reasonable for the police to tow the car. It posed a traffic hazard parked on the shoulder of Interstate 264, and no one else could have legally driven the car because it was unregistered. The officers conducted their inventory search under a written policy that properly governed what police could inspect. And although we agree with Stamps that the officers' compliance with that policy was flawed, Stamps has failed to show that the inventory search was a pretext for a criminal investigation. So we affirm the conviction.

BACKGROUND

On review of a trial court's denial of a motion to suppress, "we state the facts 'in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences.'" *Hill v. Commonwealth*, 297 Va. 804, 808 (2019) (quoting *Commonwealth v. White*, 293 Va. 411, 413-14 (2017)). Viewed through that lens, the facts are as follows.

Around 1:20 a.m. on January 5, 2023, Virginia Beach Police Officer Christopher Grimm was surveilling a house that police suspected was involved in "narcotics activity." The house shared a driveway with another home. Grimm observed a 1996 white Cadillac with antique license plates leave from the shared driveway, although Grimm could not tell if the driver had come from the house under surveillance. Stamps was driving the white Cadillac.

Grimm followed Stamps's car. After about seven blocks, Stamps drove onto Interstate 264. The Cadillac had license plates issued for an antique motor vehicle. *See* Code § 46.2-730. But when Grimm checked the Cadillac's tag number against DMV records, he could not find a match. The dispatcher confirmed that the antique license plates were not issued for that car. Grimm activated his emergency lights, and Stamps pulled over on the shoulder of the interstate. Stamps was the only one in the car.

- 2 -

When Grimm asked for his driver's license, Stamps presented his California identification card. Stamps said that he had not yet registered the car because he had only recently bought it. Grimm saw that the Virginia safety-inspection sticker on the car had expired. As Officers Klepacz and Cheatham arrived at the scene, Grimm returned to his cruiser to obtain more information about Stamps's identification.

In response to questioning from Klepacz, Stamps denied having any guns or drugs in the car. Stamps declined Klepacz's request for permission to search the car. Klepacz later admitted that he regularly asks for consent to search cars because he hopes to find drugs and weapons. The officers conferred among themselves about the possibility of calling a drug-sniffing dog to the scene, but no canine units were on duty at the time.

Klepacz reported to Grimm that Stamps would not consent to a search. By that time, however, Grimm had learned that Stamps's California driver's license had expired and that Stamps did not have a valid driver's license from any other state. Grimm responded to Klepacz that they would have to tow the car "either way" because Stamps was not licensed and the car was not registered.

At Grimm's request, Stamps got out of the car and stood near the shoulder. At that point, Grimm intended to tow Stamps's car and to issue him a summons for driving an unregistered vehicle, though not for driving on an expired license. Grimm informed Stamps that "we are going to have to tow the car because it's unregistered . . . and you're unlicensed." Stamps asked if a friend could drive it away, and Grimm replied no, because the car was unregistered. Grimm testified that the car had to be towed because it posed a traffic hazard. He worried that intoxicated drivers speeding away from the oceanfront in the early morning hours might collide with it.

At the time of the stop at issue here, the Virginia Beach Police Department operated under a general order establishing procedures for impounding vehicles and inventorying their contents. Officers were required to follow the policy when towing vehicles that, among other things, posed "traffic hazards." The order imposed on officers "the responsibility of protecting property that comes into their custody." It called for every towed vehicle to be inventoried "without delay." Officers had to search all areas of the car, including opening all containers except those with a factory seal. Items had to be listed on a PD50-6 form, without using "[t]erms such as miscellaneous, assorted or various." Items of high value—$50 or more—or those that pose a potential safety risk should be taken into custody and submitted into evidence using a PD-478 form.

Because Grimm was working on the summons, he asked Klepacz to conduct the inventory search. Both Grimm and Klepacz testified that they understood that the purpose of an inventory search is to protect the owner's property.

Klepacz began his inventory search at the driver's side door and worked his way through the passenger compartment. Although Klepacz did not yet have the PD50-6 inventory form, his body camera recorded items as he called them out. They included "keys," "tools," "paperwork," "banana," and "child seat base."

When Klepacz came around to search the trunk, Stamps, who was standing nearby, protested that the search was unlawful because he had not consented. Klepacz responded that the inventory search was both lawful and required by department policy.

Opening a black backpack that he found in the trunk, Klepacz discovered a bag of marijuana and a pistol. Because Stamps had earlier denied having any guns or drugs in the car, Klepacz directed another officer to place Stamps in handcuffs, detaining but not arresting him.

About ten minutes after Klepacz had started his search, Cheatham approached with the PD50-6 inventory sheet. Klepacz dictated a list of items he found in the vehicle for Cheatham to write on the form. Klepacz testified that he believed that Cheatham had accurately written down all the items he called out. The pistol was not listed because it was seized as evidence and listed on a PD-478 voucher. Klepacz did not complete the PD-478 voucher and did not know who did. He added that Cheatham had written Grimm's name on the bottom of the PD50-6 form because Grimm was the officer assigned to the case.

The officers had slightly different recollections of the events relating to the inventory search. Grimm said that Klepacz had filled out the PD50-6 form and had written Grimm's name at the bottom. Grimm denied completing the PD-478 evidence voucher for the pistol, claiming that Klepacz had done so. Cheatham said that both Grimm and Klepacz were conducting the search while he stood behind them documenting their findings. He said he included the items they found "[t]o the best of [his] ability," including the bag of marijuana. He later scratched out that entry because he thought the marijuana should have been taken as evidence and put on a PD-478 voucher instead.

While Klepacz and Cheatham were working on the inventory search, Grimm discovered that Stamps had a prior felony conviction, which made it unlawful for him to possess the firearm found in the backpack. Grimm said he conducted a second inventory search of Stamps's car to ensure that Klepacz had not missed anything.

Grimm arrested Stamps for being a felon in possession of a firearm. In searching Stamps's pockets incident to arresting him, Grimm discovered what he suspected to be methamphetamine and cocaine, along with $2,199 in cash.

The Commonwealth charged Stamps with possession of a Schedule I or II controlled substance with intent to distribute, possession of a firearm by a violent felon, and simultaneous

possession of a Schedule I or II substance and a firearm. Stamps moved to suppress all the evidence on the ground that the inventory search was unlawful.

At the suppression hearing, Stamps argued that his car was not a traffic hazard because it was not blocking traffic and the police could have permitted someone to move the car to a different location. He also argued that the officers failed to follow their inventory policy, such as by not filling out the PD50-6 form at the time of the search and by having different officers complete different portions of the procedures. Finally, he claimed that the inventory search improperly concealed the officers' investigatory motive. He argued that Grimm followed Stamps from a house he was investigating for drug activity; Stamps had refused consent to search his car before the officers settled on towing it; and the officers only loosely complied with the policy. The court denied Stamps's motion to suppress without specifically addressing those points.

Stamps renewed his suppression motion after this Court's unpublished decision in *Nottingham v. Commonwealth*, No. 1028-22-1, 2023 Va. App. LEXIS 629 (Sept. 19, 2023).[2] *Nottingham* held that the trial court erred in failing to suppress evidence resulting from an inventory search because the officer did not comply with his department's inventory procedures and the search was a pretext for an improper investigatory motive. Slip op. at 12, 2023 Va. App. LEXIS 629, at *18. The court again denied Stamps's motion. The court found that the ten-minute delay between when Klepacz began the inventory search and when Cheatham began filling out the PD50-6 form did not violate the department's inventory policy.

Stamps entered and the trial court accepted his conditional guilty plea to possession of a controlled substance with intent to distribute, reserving his right to appeal the denial of his

---

[2] Citation of an unpublished opinion is "permitted as informative, but will not be received as binding authority." Rule 5A:1(f).

suppression motion.[3]  He was sentenced to eight years' imprisonment with seven years and three months suspended.  Stamps noted a timely appeal.

ANALYSIS

"In reviewing a trial court's denial of a motion to suppress, 'we determine whether the accused has met his burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error.'"  *Knight v. Commonwealth*, 71 Va. App. 771, 782 (2020) (quoting *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015)).  "This Court is 'bound by the trial court's findings of historical fact unless "plainly wrong" or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'"  *Id.* at 782-83 (quoting *Cantrell*, 65 Va. App. at 56).  But "we consider *de novo* whether those facts implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon" the defendant's Fourth Amendment rights.  *Id.* at 783 (quoting *Cantrell*, 65 Va. App. at 56).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Although warrantless searches "are presumptively unreasonable," that "presumption may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'"  *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  In other words, "the warrant requirement is subject to certain reasonable exceptions."  *Id.*

One exception is the "routine practice of securing and inventorying the . . . contents" of impounded vehicles.  *South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976).  "These

---

[3] The Commonwealth nolle prossed the charges of possession of a firearm by a violent felon and possession of a Schedule I/II drug while possessing a firearm.

procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* at 369 (citations omitted); *Reese v. Commonwealth*, 220 Va. 1035, 1039 (1980) (same). The Supreme Court observed in 1987 that inventory searches had become "a well-defined exception to the warrant requirement." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987).

This Court has recognized certain limitations on the "inventory search" doctrine and the "community caretaker" doctrine from which it emanates. *See Roberts v. Commonwealth*, 82 Va. App. 61, 75 (2024). Our caselaw makes clear that police may conduct a warrantless inventory search of a vehicle "only if the following conditions are met: '1) the vehicle must be lawfully impounded; 2) the impoundment and subsequent search must be conducted pursuant to standard police procedures; and 3) the impoundment and subsequent search must not be a pretextual surrogate for an improper investigatory motive.'" *Knight*, 71 Va. App. at 784 (quoting *Cantrell*, 65 Va. App. at 59).

Stamps contends that the inventory search here failed to meet all three conditions. We address those arguments in turn.

*A. Towing the car was reasonable.*

"The validity of the impoundment is a question separate from the validity of the subsequent inventory search and must be determined first." *King v. Commonwealth*, 39 Va. App. 306, 311 (2002). "We must consider 'not whether there was a need for the police to impound [the] vehicle but, rather, whether the police officer's decision to impound was reasonable under the circumstances.'" *Williams v. Commonwealth*, 42 Va. App. 723, 731 (2004) (alteration in original) (quoting *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986)). Having some discretion whether to order impoundment is not fatal to the validity of the decision

"so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine*, 479 U.S. at 375. "Objective reasonableness remains the linchpin" of this inquiry. *Williams*, 42 Va. App. at 731 (quoting *King*, 39 Va. App. at 312). And we measure reasonableness "by examining the *totality of the circumstances*." *Fauntleroy v. Commonwealth*, 62 Va. App. 238, 247-48 (2013) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

Stamps's contention that there was no "necessity nor statutory imperative" to tow his car sets the bar well above the objective reasonableness standard we are bound to apply here. Stamps's car, although pulled to the far edge of the shoulder, sat on the side of the interstate in the darkness of early morning. Grimm decided to tow the car because it was a traffic hazard and was undrivable without a valid registration. Grimm testified that, in his experience, "a lot of intoxicated drivers leaving the oceanfront at a high rate of speed" drove along that stretch of interstate in the early morning hours. The Virginia Beach Police Department's tow policy provided for the towing of "vehicles that constitute traffic hazards." And Grimm indicated on the PD50-6 form that Stamps's car posed a traffic hazard.

Stamps's argument that he or someone else should have been allowed to drive the car away ignores the fact that *no one* could have legally driven the car. Stamps could not have done so because he did not have a valid driver's license. *See* Code § 46.2-300 ("Driving without license prohibited"). And it would have been unlawful for a licensed driver to do so because "[n]o person shall . . . [o]perate . . . a motor vehicle . . . on a highway unless . . . it is registered." Code § 46.2-613(A)(1)(i). Driving the car without a safety-inspection sticker would also have been a traffic infraction. *See* Code §§ 46.2-1157, 46.2-1158.02. Under the totality of circumstances, Grimm's decision to impound the car was reasonable and supported by "objective facts." *King*, 39 Va. App. at 311-12. "The authority of police to seize and remove from the

streets vehicles impeding traffic or threatening public safety and convenience is beyond

challenge." *Opperman*, 428 U.S. at 369.

   B.  *The search was "conducted pursuant to standard police procedures."*

   An inventory search must also be "conducted pursuant to 'standard police procedures.'"

*Cantrell*, 65 Va. App. at 60.  "Although standardized criteria relating to inventory searches are

'often codified by a police department into a uniform inventory-search policy,' '"[t]he existence

of . . . [standardized criteria] may be proven by reference to either rules and regulations or

testimony regarding standard practices."'"  *Cantrell*, 65 Va. App. at 60-61 (alterations in

original) (first quoting *Banks v. United States*, 482 F.3d 733, 739 (4th Cir. 2007); and then

quoting *Matthews v. United States*, 591 F.3d 230, 235 (4th Cir. 2009)).

   It is important not to conflate this factor with the third factor in the inventory-search

analysis.  Having standardized criteria is necessary to ensure that the inventory search does not

become "a ruse for a general rummaging in order to discover incriminating evidence."  *Florida*

*v. Wells*, 495 U.S. 1, 4 (1990).  The point is to have a policy that channels discretion.  Thus, in

*Cantrell*, we invalidated the inventory search because the local police department there "had no

mandatory policy whatsoever" and "gave individual officers unfettered discretion in the manner

in which they conducted an inventory search."  65 Va. App. at 63.  Here, the Virginia Beach

Police Department's general order governs inventory searches and provides for opening all

containers except those with a factory seal.[4]  It appropriately channels an officer's discretion.

   Whether an officer has carefully complied with his department's inventory-search policy

presents a different question.  While the failure to follow the policy might show that the

inventory search was a pretext for a criminal investigation, the pretext inquiry is the third factor,

---

   [4] The Court in *Wells* said that it would be "equally permissible" to have a policy of
"opening all containers," "opening no containers," or opening only closed containers whose
contents cannot be discerned from the exterior.  495 U.S. at 4.

not the second one.  Minor departures from the inventory-search policy do not invalidate the search itself.  Thus, in *Bertine*, the Court upheld an inventory search that the district court described as "somewhat slip-shod," 479 U.S. at 369, because the officer nonetheless was "following standardized procedures," *id.* at 372.[5]  And since *Bertine*, federal circuits have consistently held that, absent a showing of pretext, an inventory search is not invalid simply because the officer failed to strictly follow the inventory-search procedures.[6]

---

[5] Justice Marshall stressed that calling the inventory *slipshod* was "the height of understatement."  *Bertine*, 479 U.S. at 383 (Marshall, J., dissenting).  The officer failed to list numerous items on the inventory form, including large amounts of cash, and a second officer had to complete a second property form to identify the missing items and contraband that had been omitted.  *Id.*

[6] *See, e.g.*, *United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986) ("We will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search."); *United States v. Lopez*, 547 F.3d 364, 371-72 (2d Cir. 2008) (rejecting argument that inventory search was invalidated for failing to individually list items of little value); *United States v. Mundy*, 621 F.3d 283, 293 (3d Cir. 2010) (holding that officer's failure to complete the required towing report did not invalidate the inventory search, explaining that a "failure to follow through with standard procedures does not necessarily render the search unreasonable"); *United States v. Banks*, 482 F.3d 733, 740 (4th Cir. 2007) ("[T]he question before us is not whether [the officer] complied with all the written directives . . . but whether, . . . he acted in accordance with standard procedures more generally."); *United States v. Loaiza-Marin*, 832 F.2d 867, 869 (5th Cir. 1987) ("[T]he agent's failure to complete the inventory forms does not mean that the search was not an inventory search . . . . [O]ther courts addressing the same issue have concluded that failure to compile the written inventory does not render the inventory search invalid."); *United States v. Hockenberry*, 730 F.3d 645, 661 (6th Cir. 2013) ("[T]he law allows for some flexibility and practical judgment in how such searches are carried out.  Consequently, . . . the question is 'not whether the policy was complied with to the T.'"); *United States v. Cartwright*, 630 F.3d 610, 616 (7th Cir. 2010) ("[M]inor deviations from department policy do not render an inventory search unreasonable."); *United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011) ("Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search."); *United States v. Anderson*, 101 F.4th 586, 595 (9th Cir. 2024) (en banc) ("[P]erfect compliance with standard criteria is not required.").  *See also State v. Paynter*, 170 A.3d 891, 908 (Md. Ct. Spec. App. 2017) ("[T]here is no charter for the idea that an imperfection in executing an inventory search will, *ipso facto*, invalidate the entire procedure."); *Commonwealth v. Torres*, 5 N.E.3d 564, 566 (Mass. App. Ct. 2014) ("Where the police fell short was in documenting the search that had already been conducted.  We agree with the Commonwealth that this sort of after-the-fact documentation error does not by itself invalidate an otherwise valid search.").

Notably, Stamps does not claim that the Virginia Beach Police Department's general order governing inventory searches fails to provide standardized criteria that limit a searching officer's discretion. Instead, he argues that the officers failed to follow the guidelines in ways that show that the search was a pretext for a criminal investigation. We analyze that question as part of the third factor.[7]

### C. *The inventory search was not a pretext to conceal an improper investigatory motive.*

Stamps argues that the inventory search here simply masked the officers' investigatory purpose. He reasons that Officer Grimm followed Stamps from a house being surveilled for narcotics activity; Grimm checked to see if a drug-sniffing dog was available; and Officer Klepacz asked Stamps for consent to search his car and admitted that he routinely does so, hoping to find drugs or weapons. To be sure, this case would be in a different posture if the trial court had found, based on that evidence, that the inventory search was pretextual. *Cf. Knight*, 71 Va. App. at 783 (affirming trial court's finding that "the motivation for the search was improper because it was for an investigative purpose").

But the trial court made no such finding, and we must therefore conclude that it found *no* improper motive or pretext. We are required to "presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the

---

[7] We note that one of our earlier decisions did not carefully divide the analysis between the second and third factors. In *Knight*, we found that "the search of Knight's car was not a valid inventory search because although the car could be lawfully impounded, the motivation for the search was improper because it was for an investigative purpose." 71 Va. App. at 783. We added—in what constituted dictum considering that first holding—"Furthermore, the search was not 'conducted pursuant to standard police procedures.'" *Id.* at 786 (quoting *Cantrell*, 65 Va. App. at 60). The examples we gave of noncompliance with the policy only further evidenced the officers' pretextual motive. *Id. Knight* is consistent with our holding above—and with the rule in other jurisdictions, *see supra* note 6—that an inventory search that is not otherwise pretextual is not rendered invalid simply because the officer failed to strictly follow department procedures.

evidence in favor of the prevailing party." *Hill*, 297 Va. at 808 (citing *Fitzgerald v. Commonwealth*, 223 Va. 615, 627-28 (1982)). Thus, if the "'record of historical facts . . . supports conflicting inferences,' [we] 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of th[e] prosecution, and must defer to that resolution.'" *Id.* (quoting *Bowman v. Commonwealth*, 290 Va. 492, 500 n.8 (2015)). In other words, when "the trial court does not make express findings of fact, . . . it is an appellate court's function to presume that the trial court made the requisite findings of fact to support its decision." *Commonwealth v. Holland*, ___ Va. ___, ___ (Jan. 16, 2025).

As noted above, "objective facts" here established Officer Grimm's good faith in deciding to tow the car, thereby necessitating the inventory search. The car posed a traffic hazard on the shoulder of Interstate 264. And unlike in *Knight*, where the car could have been easily moved to a nearby parking spot, 71 Va. App. at 916, Stamps's car could not be driven because it was unregistered. Under the circumstances, there was no viable alternative to impoundment and the police department's general order obligated the officers to inventory the contents of the car "without delay."

Stamps argues that the officers' failure to follow the requirements of the general order shows that they simply used the inventory search as a pretext to conduct a criminal investigation. Such departures can indeed evidence improper motive. *See, e.g.*, *United States v. Anderson*, 101 F.4th 586, 595 (9th Cir. 2024) (en banc) ("It matters not that there is a standard procedure that cabins an officer's discretion if it is not followed."); *United States v. Evans*, 781 F.3d 433, 437 (8th Cir. 2015) ("Departing from standardized procedures for conducting an inventory search is evidence that helps prove the search was a pretext."); *United States v. Haro-Salcedo*, 107 F.3d 769, 773 (10th Cir. 1997) ("[The officer] explained that although he removed several items from the vehicle, he did not complete a written inventory form. These facts strongly support the

district court's conclusion that [the officer] used the roadside inventory as a pretextual investigatory search.").

But the departures from procedure on which Stamps relies fail to prove that the inventory search here was pretextual. True, Klepacz started his inventory search without actually writing anything down, searching the passenger compartment and the trunk for about ten minutes before Officer Cheatham appeared with the PD50-6 form. But Klepacz stated aloud the items that he found—information that was contemporaneously recorded by his body camera. And when Officer Cheatham returned with the form, he wrote down the information as Klepacz dictated it to him. The trial court found that the ten-minute delay did not violate the department's inventory policy, and we cannot say that its finding was plainly wrong or without evidence to support it. *Knight*, 71 Va. App. at 782.

This case is also distinguishable from cases cited by Stamps in which we found a pretextual search based on the officers' own statements that they conducted an inventory search to find evidence of a crime. The officer in *Cantrell* admitted that he conducted inventory searches "to check for contraband," a "glaring admission" that his search of the vehicle there "was not for . . . benign purposes." 65 Va. App. at 64. The officers in *Knight* explored ways to search the car and ultimately landed on an inventory search, but they did not have to tow the car and violated their own policy requiring that they advise the defendant of the option to have the car moved to a public parking place or privately towed. 71 Va. App. at 778-79, 790-91. And in *Nottingham*, we found that the inventory search was pretextual because the officer admitted at the suppression hearing that he decided to tow the car and inventory the contents because he had found a "Percocet pill" on the defendant and wanted "to look for drugs." *Nottingham*, slip op. at 10, 2023 Va. App. LEXIS 629, at *14. That strong evidence of pretext is absent here.

Finally, we reject Stamps's claim that not including the pistol on the PD50-6 form violated the general order. The Virginia Beach Police Department policy explicitly lists firearms as items that should be taken into custody and listed on a PD-478 evidence voucher, not the PD50-6 inventory form. *Accord Hogan v. Commonwealth*, 15 Va. App. 355, 363 (1992) (explaining that under the Virginia Beach Police Department's then-policy, only items remaining with the car would be put on an inventory list; other items seized for safety or evidence purposes would be put on separate voucher). Although Stamps contends that the pistol was never put on a PD-478 either (and the officers involved could not remember completing any PD-478), the record reveals that, at least by the time of the plea agreement, the pistol had been given an evidence voucher number. We have no reason to conclude that the officers failed entirely to voucher the pistol as evidence.

## CONCLUSION

The trial court did not err in denying Stamps's suppression motion. Officer Grimm properly impounded Stamps's car, necessitating the inventory search that followed. The officers conducted the inventory search under standard police procedures. And the evidence supported the trial court's finding that the inventory search was not a pretext for a criminal investigation. Thus, we find no basis to set aside the conviction.

*Affirmed.*